THE COMMUNITY BUILDERS, INC., & others[1] vs. INDIAN
MOTOCYCLE ASSOCIATES, INC.,[2] & others.[3]

No. 94-P-0884.

Suffolk. October 20, 1995. - April 7, 1998.

Present: ARMSTRONG, JACOBS, & LAURENCE, JJ.

*Contract,* Construction of contract, Damages, Performance and breach,
Modification. *Accord and Satisfaction. Damages,* Breach of contract, Inter-
est, Attorney's fees. *Consumer Protection Act,* Damages.

The revision of a service contract did not operate to terminate disputed claims
under the original contract, in circumstances in which the defendants failed
to comply with the revised terms. [547-550]
On a claim for fees for services rendered under a consulting agreement, the
fact finder properly calculated the fees due to the plaintiff under the terms
of the final, integrated agreement between the plaintiff and the defendants;
further, the defendants failed to demonstrate that they were entitled to a
credit against the total amount due to the plaintiff. [550-553]
In a breach of contract claim alleging that the defendants had failed to consum-
mate a contract for an equity syndication, the evidence did not warrant the
finding that the defendants acted in bad faith by failing to reach agreement
on various terms, where such terms were expressly subject to the
defendant's authorization and where there was no evidence that the actions
of the defendants in renegotiating such terms were undertaken in an at-
tempt to sabotage the project [553-557]; similarly, the defendants could not
be held liable to the plaintiffs for future speculative damages arising out of
the failed syndication [557].
In a breach of contract claim, liability of the defendants under c. 93A, § 11,
was appropriate where the evidence demonstrated that the defendants had
engaged in a pattern of unfair and coercive conduct toward the plaintiff

---

[1]Stephen J. Anthony, Jonathan M. Keyes, and Christopher L. Noble, as
trustees of the Community Builders Charitable Trust.

[2]As general partner of Indian Motocycle Associates Limited Partnership
(IMALP). The other general partner of IMALP, Upper State Street IMB
Corporation (USSIMB), and its parent company, Upper State Street Com-
munity Development Corporation (USSCDC), have not appealed from the
judgment against them. Following the issuance of the first master's report,
IMALP filed a suggestion of bankruptcy in the Superior Court.

[3]Merwin H. Rubin and H. Joel Rahn. Rubin and Rahn are the sole principals
and shareholders of Indian Motocycle Associates, Inc. (IMA).

and had violated the implied covenant of good faith and fair dealing in the contract at issue [557-559]; and where the sole principals and shareholders of a defendant corporation had personally participated in this pattern of behavior, individual liability under c. 93A was also appropriate [559-560].

A plaintiff seeking restitution of monies lent to one of two general partners of a general partnership could not maintain an action on a theory of unjust enrichment against the second general partner, its sole principals and shareholders, and the general partnership itself, where the plaintiff failed to demonstrate that any of these defendants were unjustly enriched. [560-561]

CIVIL ACTION commenced in the Superior Court Department on December 15, 1988.

The case was heard by *Hiller B. Zobel*, J., on a master's report.

*Thomas W. Evans* for the plaintiffs.

*Francis J. DiMento* for the defendants.

ARMSTRONG, J. The plaintiff Community Builders, Inc., known at the time of the events recounted herein as Greater Boston Community Development, Inc. (and thus referred to in the record and in this opinion as GBCD), brought this action to recover fees for consulting services it rendered to a limited partnership, Indian Motocycle Associates Limited Partnership (IMALP), in connection with the conversion of a historic but dilapidated factory building in Springfield into 139 units of mixed low-income and market-rate residential housing. The plaintiff Community Builders Charitable Trust, affiliated with GBCD, sued to recover $25,000 loaned to Upper State Street Community Development Corporation (USSCDC), a charitable corporation, as seed money for the project. The defendants appeal from judgments against them totaling $2,464,089.74, entered on a master's report.

FACTS.

The factory building, located in the Winchester Square section of Springfield, was constructed in stages between 1883 and 1913 and was the site of the Indian Motocycle Company (the "r" was dropped from the word motorcycle as part of the company's trademark), the first commercial manufacturer of gasoline-powered motorcycles. Indian Motocycle was the world's largest supplier until the early 1930's, when competition from lighter weight machines started the company's decline. It vacated the building in 1953, subletting to a succession of light industrial users until the late 1960's, when the building fell into disuse.

In the early 1980's, the defendants, Merwin H. Rubin and H. Joel Rahn, developers who had done.business together as R & R Marketing, Inc., were discussing rehabilitation of the Indian Motocycle Building with USSCDC in connection with urban revitalization in Winchester Square. Rubin and Rahn, although experienced in real estate dealings, had not previously engaged in the development of subsidized housing, and the early efforts of USSCDC and the two men, assisted by consultants other than GBCD, to put a viable project together were by 1985, as one witness stated, "dead in the water." Although the Massachusetts Housing Finance Agency (MHFA) had given an initial loan commitment of $5 million to the project, no viable financial plan had been developed. Despite the fact that Rubin and Rahn had put money of their own into the project and had incurred a debt of $160,000 to one of the two early development consultants, there was in late 1985 no prospect of a significant infusion of money from outside investors.

In the fall of 1985 representatives of MHFA, USSCDC, and the Executive Office of Communities and Development met with GBCD to engage it as the development consultant. GBCD was a non-profit corporation with extensive experience as a consultant in the construction, rehabilitation, maintenance, and management of low and moderate income and elderly housing. Its consulting activities had ranged from assisting community sponsors in finding sites, putting together development teams, managing the architects and contractors, locating financial resources, and undertaking the leasing and management of housing on completion.

GBCD agreed in October, 1985, with USSCDC to act as a development consultant, at a fee for its services of 2.75 times the salary costs of its professional employees plus expenses other than local travel and phone. It was to be paid at the time of the MHFA loan closing for services rendered to·that point and would be paid quarterly for its services thereafter. Later in 1985 GBCD agreed to cap the fee for its services at $35,000 provided the MHFA loan closing occurred by March 31, 1986. In December, 1985, USSCDC and IMA agreed to form a partnership (IMALP) to act as developer.

Progress was to be slow. Over a year after that date — on February 6, 1987 — GBCD· proposed a new development consulting agreement providing that GBCD's fee would be capped at $55,000 provided that the MHFA loan closed by

March 31, 1987. If that deadline passed, "then an increase in the maximum fee shall be negotiated by IMA[4] and GBCD." The proposal also provided that GBCD would act as management agent for the completed project for at least two years at fees approved by MHFA, and that the partners would receive and consider a syndication proposal from GBCD by which GBCD would act as agent for the developers in raising outside equity monies. Rubin agreed to the proposal on March 2, 1987, signing as treasurer of "Indian Motocycle Associates, Inc., General Partner."

The new target date for the MHFA closing also passed. Even before full construction started, the designated general contractor, engaged in preliminary work at the building, had encountered numerous safety problems leading to cost overruns and work stoppages. The city had condemned the building; building permits were held up; unanticipated asbestos-removal costs were incurred; the general contractor, upset by dilatory payments on its invoices and owed $221,000, stopped work until it should be paid in full and receive a guarantee of timely payment in the future. Financial projections had to be revised repeatedly to reflect rising costs. Meanwhile, a new urgency confronted the project. The Tax Reform Act of 1986 had adversely affected the tax benefits available to private investors in housing projects not completed and operating by the end of 1988, and the financial projections depended on raising $7,600,000 from private limited partner subscriptions.

On April 29, 1987, Austin Miller, who headed GBCD's Springfield office and was its principal operative assigned to the Indian Motocycle project, sent a memorandum to the general partners (i.e., Rubin & Rahn for IMA, and the president of USSIMB) giving a comprehensive review of the status of the project and emphasizing the urgent need to make certain decisions to permit it to go forward. In that memorandum, he stated again the basis on which GBCD was computing its fee, billing for which was still deferred because the MHFA loan had not closed. Miller reiterated the formula — 2.75 times salary costs of professional employees plus extraordinary expenses — and he estimated that its total bill for development consultant services to completion of construction would approximate $155,000. No mention was made of a cap.

In early May, Miller prepared a "Memorandum of Agree-

[4]IMALP was not legally formed until June, 1987.

ment" for signature by the principals of the two general partners. It recited that the parties had agreed to the terms of the April 29 memorandum and also that GBCD, in addition to acting as the development consultant and as the management agent, would also act as the syndication consultant and, in this connection, would be authorized to negotiate and enter into an agency agreement with Tucker, Anthony & R. L. Day (Tucker Anthony) for marketing limited partner shares in the project. GBCD's fee for this work was to be three percent of the gross syndication proceeds plus its usual hourly fee and expenses, subject, however, to a cap of $175,000. On May 12, 1987, Rubin signed for IMA[5] but only after interlineating changes into the text. For "Memorandum of Agreement" he substituted "Letter of Intent." Where the original recited that the partners and GBCD had reached an agreement on terms, Rubin substituted that they had reached a "general understanding of terms subject to further refinement and authorization of the partners." In the authorization for GBCD to negotiate and enter into an agreement with Tucker Anthony, Rubin inserted, "subject to the authorization of the partners."

On June 10, 1987, GBCD (by Miller) furnished a new letter of agreement defining all of GBCD's roles — now up to four, agreement having been reached that it would act as investor services agent for the limited partners, furnishing them with investment monitoring reports, annual tax information, and audited financial statements. GBCD's compensation in each of the four roles was spelled out in detail. (1) For its services as development consultant, GBCD was to receive 2.75 times salary costs of its professional employees plus extraordinary expenses and professional services provided by anyone not on GBCD's staff. (No cap was mentioned, nor an estimate.) (2) For its services as syndication consultant, exactly the same formula applied to hours and expenses, but subject to a cap of $175,000, plus extraordinary expenses and outside professional services. In addition, it would receive a fee of "three percent of the equity financing raised for the development." (3) For its services as project manager after construction, GBCD would receive the

[5]Rubin and Rahn had styled themselves "Indian Motocycle Associates" as early as 1984, and they formalized the title by incorporating the business in June, 1986. The designation IMA, as used in this opinion, always refers to the corporation.

fee approved by MHFA, subject to a limit of $300 per unit.[6] (4) For its services as investor services agent, GBCD was to be paid a fee of "$10,000 per year in years 1987 to 1994; and $5,000 per year in years 1994 [*sic*] to 2003." A final paragraph specified: "Payment in full for GBCD's services prior to initial MHFA loan closing will be due at the time of the initial closing,[7] and payment for services provided thereafter will be due quarterly." Rubin, for IMA, general partner, subscribed the document indicating his acceptance of its terms on June 29, 1987. Before signing, Rubin made several interlineations, only one of which (see note 6, *supra*) related to GBCD's compensation. It was this agreement ("the June, 1987 agreement") that was to govern the trial court's computation of damages.

The project at this point showed some promise. The MHFA loan commitment had been increased to $8,571,000. A low interest, urban development action grant ("UDAG") loan of $1,560,000 had been pledged, as well as a "weatherization grant" of $200,000. The equity syndication, expected to be completed by December, 1987, would bring in $7,600,000 (although in stages). "SHARP"[8] loans would subsidize operating revenues. A bridge loan of almost $4 million from an institutional lender was anticipated to fund construction requisitions until the various resources became available.[9]

Nevertheless, the project remained starved for cash. The MHFA loan proceeds were not actually distributed until December 31, 1987, and before that time the equity syndication had fallen apart. Rubin kept finding mistakes in the proposed

---

[6]As manager for the project after construction, the typewritten agreement provided that GBCD was to receive the annual fee allowed by MHFA. Rubin inserted, "not to exceed $300 per unit."

[7]The "initial closing" refers to the events beginning with the execution of the mortgage loan documents and their recording, through funding, enabling the developer to draw down the proceeds. "Final closing" refers to the conversion (after the last drawdown) from construction loan status to permanent loan.

[8]State Housing Assistance for Rental Production program, providing Commonwealth subsidies for low-income housing developments.

[9]As we understand the record, loans from IMA had been funding construction to that point and some of the bridge loans would be used to transfer the project debt from IMA to the institutional lender. The profit to the developers would be in the form of a developer's fee, which would be divided between IMA and USSIMB in equal shares. GBCD estimated on July 1, 1987, that $2,562,445 would be available for the developers' fee, beyond the repayment of advances to IMA.

"Confidential Private Offering Memorandum," a voluminous document (166 pages) that was the basis for sales of limited partner interests, and he insisted on renegotiating certain terms of the agreement GBCD had worked out with Tucker Anthony, in part to provide for deferral of Tucker Anthony's brokerage fees. (The June, 1987, agreement had carried forward the limitation on GBCD's negotiating authority that Rubin had interlineated in the May, 1987, "Letter of Intent.") Tucker Anthony was exasperated because it had been "pre-selling" limited partner interests during June and July, and it had emphasized that the underlying agreements could not be altered without jeopardizing those commitments. In August, Tucker Anthony learned that Rahn was named as a defendant in a securities fraud action pending in the Federal District Court for the Southern District of California, contrary to representations that Rahn had made on June 10, 1987, on a form that New York State required in connection with Tucker Anthony's sale of securities there. (Rahn had earlier entered into a stipulation of dismissal with the prosecutor, but the stipulation was not filed in court and approved by the judge until late October, 1987.) On August 25, Tucker Anthony withdrew as broker, asking GBCD to reimburse it for its expenses.

The final closing of the MHFA loan took place December 31, 1987, and, under the terms of the June, 1987, agreement, GBCD expected payment for its service to that point. Rubin disbursed only $10,000, applied by GBCD to the outstanding bill for its development consultant services, which GBCD calculated as $193,449.73.[10]

On March 18, 1988, Miller sent a letter to Rubin demanding payment by the end of March of the overdue invoices through December 31, 1987, in the amount of $405,861.74.[11] On March 21 Rubin sent a memorandum to Rahn in which he stated that

---

[10]GBCD originally submitted its statement for development consultant services as $218,449.73, but that included an extraordinary expense for accounting services for Coopers and Lybrand that Rubin argued, and GBCD agreed, should be attributed to the equity syndication services. GBCD submitted revised statements for the two categories of service, in which the amount due for equity syndication services, originally stated as $197,412.01, was restated as $222,412.01. (This sum included $92,123.38 in outside legal and accounting services, which were not subject to the $175,000 cap.)

[11]The $405,861.74 represented the total of the development consulting bill, $193,449.73, and the equity syndication consulting bill, $222,412.01, less the $10,000 payment on December 31, 1997.

the bill came "as an absolute shock" and indicated his intention to disavow responsibility for the equity syndication services[12] and to try to compromise the development consultant services down to $120,000 through to completion of construction.

On May 31, 1988, on the basis of discussions with Rubin, Miller furnished a letter of agreement to Rubin and to the treasurer of USSIMB representing a compromise of the bill for development services, and, in effect, amending the June, 1987, agreement. All three men executed the May 31, 1988, agreement that day. The terms of the agreement were as follows:

(1) Compensation for GBCD's services as development consultant up to project completion would be subject to a cap of $300,000.

(2) Against the $300,000, the $10,000 previously paid was credited; $40,000 would be payable at signing; $50,000 would be paid on June 1, 1988; and a second $50,000 would be paid on July 1, 1988.[13]

(3) Of the remaining $150,000, $120,000 would be contingent and payable on raising additional funds for the project of $2,650,000 from specified sources, or, if less should be raised, a pro rata part of the $120,000.

(4) $30,000 would be paid unconditionally upon completion of construction.

(5) The sections of the June, 1987, agreement relating to GBCD's functions were completely rewritten, so as to retain only its role as development consultant, which was itself redefined.

(6) The portions of the June, 1987, agreement entitling

---

[12]"After we rejected Tucker Anthony's deal, [Miller] informed me that GBCD incurred substantial legal and accounting bills with Hale & Dorr and Coopers & Lybrand. My reply has always been that they undertook the syndication on a best efforts basis for a potentially significant fee. Therefore, any costs incurred were based on their anticipated success and we are not liable for any of their costs or time involved."

[13]The spacing of only one day between the $40,000 and the first $50,000 installments seems peculiar and is possibly explained by the parties having agreed to the June 1 and July 1 payments in anticipation that the agreement would be signed earlier than May 31.

GBCD to its percentage fee (three percent) of the partner-ship syndication, its fee as post-construction management agent, and its fee as investor services consultant were similarly deleted.

(7) Not deleted, and deliberately left unmodified,[14] was the provision of the June, 1987, agreement providing for GB-CD's hourly fee for its services in preparing for the unsuccessful equity syndication. As to this fee, GBCD made clear it would seek to enforce its rights.

A few days after the May 31 signing, Rubin (for IMALP) sent GBCD a check for $40,000. The $50,000 installment due on June 1 was not forwarded "for several weeks." The July 1 installment of $50,000 had not been received by July 11, 1988. On that date GBCD (by Miller) sent a letter to the general partners of IMALP terminating all contractual agreements between GBCD and IMALP "[a]s a result of your continued failure to make payments in a timely manner and other defaults." The letter specified that GBCD would "hold you responsible for all amounts due and owing to us, and for all our damages resulting from your breach of contract."

The termination by GBCD put the Indian Motocycle project in further jeopardy with prospective lenders, and Rubin's and Rahn's reaction was to accuse GBCD of unjustified termination and breach of contract, charges that materialized in the defendants' counterclaims in this action.[15] In late November, 1988, Rubin sent a check for the July 1, $50,000 installment to GBCD, but the check contained a restrictive endorsement that the master, supported by the evidence, found would have required GBCD to surrender all of its remaining claims against the defendants. Declining to waive its claims for damages, GBCD returned the check to Rubin uncashed.

## PROCEEDINGS.

The action, filed in December, 1988, was referred to a master (facts final) for trial. After a trial lasting thirteen days, the

---

[14]"This letter should not be construed as an admission by either party with respect to any matter not specifically addressed herein."

[15]The counterclaims were dismissed by the judge, following the recommendation of the master. The counterclaims have not been argued in this appeal, and they need not be detailed herein.

master, on June 29, 1992, filed a report of sixteen pages finding for GBCD on liability. He assessed actual damages of $634,178.65 against IMALP and its general partners, IMA and USSIMB, recommended doubling that figure due to the defendants' violation of G. L. c. 93A, and left attorneys' fees and interest for the court's determination. On September 11, 1992, the judge entered an order striking the report and recommitting the case to the master for more detailed findings, including findings on attorneys' fees. The master, in response, adopted with ten exceptions[16] the draft findings (313 in number) that had been proposed by GBCD's counsel prior to submission of the original report and assessed damages identical to those found in the original report. The judge struck two additional findings and portions of two others[17] but felt that the deletions did not affect the master's calculation of damages. He adopted the report as modified, and judgments were entered on July 23, 1993, for the plaintiffs in the aggregate amount of $2,464,089.74 (of which $2,415,740.75 was for GBCD and $48,348.99 was for the trustees of the GBCD's charitable trust that had loaned USS-CDC $25,000 of seed money). The total included an award for the plaintiffs' attorneys' fees and expenses in the amount of $637,933.62, as computed by the master on recommittal, and $532,798.82 in interest.

## DISCUSSION.

The damages found by the master, exclusive of interest and the attorneys' fees, were as follows:

| | |
|---|---|
| For development consultant services and expenses, | $ 155,900.02 |
| For syndication consultancy time and expenses, | 130,278.65 |
| For the lost syndication percentage fee, | 228,000.00 |
| For the lost fee for services as | |

---

[16]The ten findings not followed were to the effect that Rubin had been guilty of intentional misrepresentations, in particular by promising payment of fees that he had no intention of paying.

[17]The findings struck by the judge were to the effect that Rubin and Rahn had assured GBCD that they would personally make funds available to the partnership to pay its bills and that GBCD relied on that assurance when it undertook work for the project.

| investor services manager, | 120,000.00 |
| Subtotal | $ 634,178.65 |
| Doubling of damages for G. L. c. 93A violation, | 634,178.65 |
| Liability for seed money loan to USSCDC, | 25,000.00 |
| Total damages | $1,293,347.30 |

Each of these categories of the damages is challenged in this appeal, as they were in the defendants' objections to the report. We discuss each in turn.

1. *Development Consultant Damages.* The figure found by the master was the total of GBCD's hourly billings and expenses, $255,900.01,[18] less the $100,000 in payments by IMALP credited to the development consultant billings. The defendants argue principally that the master and the judge erred by calculating these damages under the June, 1987, agreement rather than under the May 31, 1988, agreement. The latter, they argue, was a substituted contract, and it limited GBCD's development consultant fee for past services to $150,000. Of that figure all that remained to be paid, they argue, was $50,000, representing the unpaid July 1, 1988, installment. The master concluded that the May, 1988, agreement was an accord only, not having the effect of discharging the defendants' earlier obligation unless fully executed, and thus entitling GBCD to look to its rights under the June, 1987, agreement when the defendants failed to comply with the new payment terms.

Not infrequently, as here, a close question is presented whether a contract revision, intended to settle claims that have arisen against a party during performance, operates to terminate the disputed claims regardless whether the party complies with the revised terms.[19] The question is not one of fact, on which we would be bound by the master's conclusion. It is true that

[18]The total consisted of $184,229.45 for billings through December 31, 1987; $36,483.73 for January-March, 1988; $22,422.67 for April-June, 1988; $11,849.94 for July-September, 1988; and $914.22 for October-December, 1988.

[19]In cases where it is held that full performance of the revised contract terms is necessary to extinguish or discharge claims arising under the old contract, the revised contract is called an "executory accord," and the performance is called a "satisfaction." In cases where the mutual promises in the revised contract are held by themselves to discharge all claims arising

the parties' intent when they signed the May, 1988, agreement, is pivotal and that intention sometimes presents a question of fact. Examples are found in such decisions as *Concannon* v. *Galanti*, 348 Mass. 71, 73-74 (1964), and *Puma* v. *Gordon*, 9 Mass. App. Ct. 489, 495 (1980), both cited in *V. & F. W. Filoon Co.* v. *Whittaker Corp.*, 12 Mass. App. Ct. 932, 933 (1981). The issue may become one of fact if the settlement involves oral revisions or revisions inferred from the parties' behavior, and the question of their intention turns on disputed evidence. "Where the new agreement is oral and the words used are in dispute, the question [of intention] becomes one for a jury." 6 Corbin, Contracts § 1293, at 190-191 (1962). Where, however, as here, the material facts are not in dispute, and the question of the parties' intention turns on the language of original and revised written agreements, "the question of intention [is] to be determined by the usual process of interpretation, implication, and construction." *Ibid.* The question in such cases is one of law for the court. *Tuttle* v. *Metz Co.*, 229 Mass. 272, 275 (1918). *Lipson* v. *Adelson*, 17 Mass. App. Ct. 90, 92 (1983), and cases cited.

GBCD relies on the factors listed in Restatement (Second) of Contracts § 281 comment e (1981), as indicators of an accord executory rather than a substituted contract: (1) negotiations did not begin until after IMALP had broken the June, 1987, agreement; (2) IMALP's duty under the June, 1987, agreement to pay at the time of the MHFA loan closing was clear rather than doubtful; (3) IMALP's duty was simply one to pay money; (4) the amount due was undisputed; (5) the amount was liquidated; and (6) the obligation had matured. The first three factors fit the case well (compare *Goldstein* v. *Widett*, 360 Mass. 126, 131 [1971]); the last three are subject to dispute. More pointedly applicable is the presumption, settled by authority, that an intention to relinquish a debt in return for a mere promise to pay a lesser amount, rather than for the performance of that promise, is unusual and is not to be implied in the absence of language compelling that result. *Banionis* v. *Lake*, 289 Mass. 146, 147-148 (1935). *Sherman* v. *Sidman*, 300 Mass. 102, 106 (1938). *McFaden* v. *Nordblom*, 307 Mass. 574, 576 (1940). *Lipson* v. *Adelson*, 17 Mass. App. Ct. at 92.

The defendants argue that the May, 1988, agreement must be

under the earlier contract, the revised contract is called a "substituted contract." See Restatement (Second) of Contracts §§ 279, 281 (1981).

regarded as a substituted contract because it revised more than the amount of the past indebtedness. It eliminated the portions of the June, 1987, agreement by which GBCD was to act as project manager after construction and as investor service agent. It rewrote GBCD's duties as development consultant, wholly altered the basis for payment, and gave it the opportunity to earn more in that role than originally anticipated.[20] Inconsistency between two agreements can be an indication of substitution. See 6 Corbin, Contracts § 1296 (1962). In *Lipson* v. *Adelson*, we said that "any accord, by definition, involves a substituted performance; and to bring a case within the inconsistency principle the substitution should be such as to show a contradictory intention, as, for example, if a second contract should call for the building of a house according to a different set of plans from those contemplated originally." 17 Mass. App. Ct. at 94.

The May, 1988, agreement, however, on examination, is not in true contradiction to the earlier agreement except as to terms of payment. GBCD's role as development consultant was restated but not different from — only less extensive and more clearly defined than — its earlier role. The elimination of GBCD's post-construction roles bespoke primarily a desire to minimize its involvement with IMALP — in particular, with IMA and Rubin — while seeing its development consulting job through to the completion of construction. As to the payment terms, it was willing to give up its accrued claim for time spent as development consultant as well as its contingent percentage fee on the equity syndication, in return for prompt payment of $150,000, and a clear agreement on the balance that would be owed.[21] On a practical level it is difficult to believe that GBCD would have been willing to surrender a substantial part of its claims for fees in return for the mere promise of one who had not abided by his agreements in the past. Compare *Goldstein* v. *Widett, supra.*

In applying the inconsistency principle, Professor Corbin

---

[20]The defendants refer to the new $300,000 fixed amount for GBCD's fee, $120,000 of which was subject to future contingencies. As of May 31, GBCD had already earned an amount between $220,000 and $240,000 as development consultant under the terms of the June, 1987, agreement. See note 18, *supra.*

[21]The new fee arrangement did not depend on time spent, Rubin having questioned the computer printouts itemizing hours for GBCD professional employees, as well as the status of at least one of the listed employees as a qualifying professional for time computation purposes.

wrote that "the inconsistency may exist as to the whole of the former contract or claim or only as to a part. [The new agreement] operates as a discharge by substitution only so far as the inconsistency extends." 6 Corbin, Contracts § 1296 (1962). The May, 1988, agreement operated to alter GBCD's future role in the Indian Motocycle project and discharged both parties from their obligations under the project management provisions, the investor services provisions, and the syndication consulting provisions, except for GBCD's claim for its time spent on the failed syndication. It did not destroy GBCD's claim based on time spent as development consultant, regardless of IMALP's compliance with the compromised payment terms. The master and the judge correctly looked to the provisions of the June, 1987, agreement to determine GBCD's fee as development consultant.

The defendants raise other objections to the finding of $155,900.02 as damages for the unpaid portion of that fee. GBCD, they argue, could not properly claim for development consultant services rendered before the June, 1987, agreement was signed. The argument has no merit. Obviously all parties expected GBCD to be paid for its services, but a combination of the time constraints on the completion of the project and Rubin's constant revision of contract drafts caused formal agreements to follow the commencement of services they were to govern. In these circumstances, the agreements were properly read to cover past services where the contrary was not stated. The claim that GBCD was not justified in terminating the contract on July 11, 1988, only a few days after the final $50,000 became due, loses sight of the defendants' record of persistent failure to pay bills when due. Having agreed to relinquish much in return for prompt payment, GBCD was entitled to insist on it. Moreover, the fact that the payment was not tendered until November, and then with a restrictive endorsement that made it problematic to accept (see *Worcester Color Co.* v. *Henry Wood's Sons Co.*, 209 Mass. 105, 108 [1911]; *Wong* v. *Paisner*, 14 Mass. App. Ct. 923, 924 [1982]; G. L. c. 106, § 1-207), hardly strengthens the defendants' contention that the delay was de minimis.

2. *The Syndication Consultancy Time-Based Damages.* The master found that the time charges and expenses billed by GBCD for syndication or equity consultant services were incurred and properly billed, a finding the defendants do not

now contest. They also concede that the language in the June, 1987, agreement on its face entitled GBCD to recover time charges for its work as syndication consultant and, in addition, three percent of the gross proceeds raised by the equity syndication.[22] Their position is that the language used inaccurately described the intention of the parties, and that their actual intention was reflected in the May 15, 1987, letter of intent, in which Rubin, before signing, had crossed out typed words that in substance stated what was later written in the June, 1987, agreement, and inserted by interlineation words that would (the defendants contend) have limited GBCD to the three percent commission on any successful equity syndication plus reimbursement for legal and accounting expenses up to $175,000.[23] Rubin testified that his intention, accurately reflected in the May 15 letter of intent, was to put in place a "best efforts" scheme of compensation for GBCD's syndication services, by which he

[22]Part III, *Fee and Payment*, read in pertinent part:

". . . 2. GBCD shall be reimbursed for its [syndication consulting] services at two-point-seven-five (2.75) times the salary costs of GBCD professional employees . . . . This shall include all costs of local travel and telephone, but GBCD shall in addition bill [IMALP] for extraordinary out-of-pocket expenses such as long-distance travel, filing fees, printing fees (but not day-to-day cop[y]ing of routine documents), and professional services provided by anyone not on GBCD's staff. The total reimbursement to GBCD under this paragraph, Part III, *Fee and Payment*, Paragraph 2, shall not exceed $175,000.

"3. In addition to the reimbursements of Paragraphs 1 and 2 above, GBCD shall receive a fee in the amount of 3% of the equity financing raised for the development. . ."

[23]The May 15 letter of intent read as follows, the bracketed words being those struck out by Rubin from the typewritten text and the italicized words being those Rubin interlineated:

"The Partners and GBCD agree, however, that the payment to GBCD for costs and fees relating to the syndication offering shown on the attached current financial projections shall be 3% of Gross Syndication Proceeds for its services as Financial Consultant plus an amount not to exceed $175,000 for Legal, Accounting [& GBCD staffing costs] *expenses incurred in connection with the production of the Informational Memorandum for syndication of the Project, which costs shall be subject to audit by the Partners.*"

meant, "We pay if you succeed. If you do not succeed, we owe you nothing."

It was Rubin, of course, who by his interlineations changed what was to be a final agreement into the May 15, 1987, "Letter of Intent," which was expressly dubbed (in Rubin's writing) only a "general understanding" and made subject to further negotiations and subsequent agreement. There *were* negotiations, and the product was the June, 1987, agreement, which was clear in providing for *both* forms of compensation to GBCD, the hours-based fee and the percentage fee. The latter was contingent, by implication, on the success of the equity syndication. The former was not. The June, 1987, agreement was properly found by the judge to be integrated, expressing the whole intention of the parties. The parol evidence rule bars reliance on preliminary negotiations to undermine unambiguous language in a final, integrated agreement. *New England Financial Resources, Inc.* v. *Coulouras*, 30 Mass. App. Ct. 140, 145 (1991). It is fundamental, moreover, that Rubin's alleged misunderstanding of what he was signing on June 29, 1987 (the master was not required to believe Rubin misunderstood) would not be a basis for avoiding the contract terms unless the misunderstanding was shared by GBCD. *Covich* v. *Chambers*, 8 Mass. App. Ct. 740, 749 (1979).

The defendants raise a second objection, this one to the master's failure to apply the $175,000 cap. The time charges found by the master were $130,278.63, well under the cap. The defendants' argument is that the master failed to take account of the legal and accounting expenses billed for the equity syndication services to GBCD. GBCD's bill to IMALP for equity syndication, as revised March 31, 1988, claimed reimbursement for $92,123.38 for fees of the law firm of Hale & Dorr and the accounting firm of Coopers & Lybrand. Such expenses were covered by the cap, and the defendants argue that IMALP's direct payment of these expenses means that the maximum that GBCD can recover within the cap for time charges is $82,876.62 (i.e., $175,000 less $92,123.38). The defendants, however, offered no evidence to back up their counsel's assertion in closing argument that they paid the legal and accounting expenses and were thus entitled to that credit against the cap. The defendants give no record citation to support their assertion here that they made such a payment. See Mass.R.A.P. 16(e), 365 Mass. 862 (1974), and *Swerling-Ginsberg-Lynn Adjusters, Inc.* v. *D & E*

*Realty Co.*, 15 Mass. App. Ct. 908 (1982). Apart from GBCD's invoice, the only reference we have found in the trial record is the assertion by defendants' counsel in argument, which is not evidence. *Commonwealth* v. *Killelea*, 370 Mass. 638, 648 (1976). Payment is a matter of affirmative defense, Mass.R. Civ.P. 8(c), 365 Mass. 750 (1974), and the burden of proof lay with the defendants. *Tudor Press, Inc.* v. *University Distrib. Co.*, 292 Mass. 339, 340-341 (1935).

For the reasons stated in the last section, the master did not err in including services rendered prior to the May 15 letter of intent in his computation of syndication time charges. The $5,682 in time charges that were billed to IMALP in the three months following Tucker Anthony's withdrawal did not represent services rendered for the benefit of USSCDC, which were separately itemized to a different billing account number. Moreover, although the defendants mentioned $5,682 in one portion of their objections to the report in the trial court, they failed to include the particular findings bearing on the billings in question (nos. 99-104) in their list of findings that they sought to have modified or struck. See *Libman* v. *Zuckerman*, 33 Mass. App. Ct. 341, 345-346 (1992).

There was no error in holding IMALP and its general partners liable to pay the $130,278.63 in time charges for syndication services.

3. *The Percentage Fee for the Failed Equity Syndication.* The equity syndication that was being prepared by GBCD and Tucker Anthony would have amounted to $7,600,000. Recognizing the urgency of a prompt syndication, Tucker Anthony had pre-sold about half of the limited partner shares while GBCD was still trying to conclude the terms of the "Confidential Private Offering Memorandum." Agreement on those terms was held up, however, because Rubin, whose authorization was required, never agreed to all the terms. Tucker Anthony finally balked at Rubin's reopening of issues that Tucker Anthony had thought settled by its discussions with GBCD. The basis on which the master held the defendants liable for the three percent commission was his finding that the syndication was imminent and would have gone through but for Rubin's bad faith conduct during the negotiations, including his insistence on reopening previously settled points. The master analogized the case to *Anthony's Pier Four, Inc.* v. *HBC Assocs.*, 411 Mass. 451, 471-474 (1991). There, the plaintiff Athanas's letter disapproving

changes in a development plan derailed the execution of the plan and was held to be a violation of the implied covenant of good faith and fair dealing of his contract with the developers.

The *Anthony's Pier Four* case is not analogous to this. The changes Athanas disapproved had no material effect on his interests, and he was open in telling the developer that his sole purpose in disapproving the changes was to force the developer to give the Athanas family a larger share in financial return from the development than he had originally contracted for. The disapproval was a pretext to break the contract. "I'd rather look out of my window on nothing," Athanas said, "than on a lousy deal." 411 Mass. at 462.

Rubin and Rahn, in contrast, were not undermining a contract. The terms of the equity syndication and agreement with Tucker Anthony may have been settled with GBCD but not with Rubin, whose authorization was needed under the June, 1987, agreement. It is true that one of the attachments to the May 15 letter of intent set out terms of an agreement with Tucker Anthony,[24] but the May 15 document was only a "general understanding," expressly subject to further negotiation and refinement. GBCD's authority to negotiate and enter into an agency agreement with Tucker Anthony was made subject to later authorization by the partners, and a reference to the draft agreement was supplemented by adding, "as the same may be amended." Tucker Anthony may have assumed that IMALP would accept any agreement negotiated by GBCD, but GBCD's negotiations were always subject to IMALP's authorization.

Under the draft terms of the Tucker Anthony engagement, the defendants understood that they would be required to execute a repurchase agreement, a construction completion guarantee, and an operating deficit guarantee (including a subordination agreement), all standard for this type of transaction.[25] As the details of the informational memorandum were fleshed out, IMALP (by

---

[24]The attached document outlined in broad terms that Tucker Anthony would be engaged as the syndicator. Its fee was agreed, as was the time frame for the syndication. It was agreed that GBCD would prepare final financial projections which outside accountants would certify, and that GBCD, in conjunction with outside attorneys, would expand and complete the offering memorandum for investors.

[25]A repurchase agreement (also known as a buy-back agreement) is a guarantee by the general partners to return the investment of the limited partners if certain benchmarks are not met by certain dates. An operating deficit guarantee (also known as a negative cash flow guarantee) is an agree-

Rubin) asked Tucker Anthony to delay its receipt of a portion of its suggested compensation until the United States Department of the Interior had given the project a needed historic certification and, in addition, sought to have Tucker Anthony and GBCD agree to lower their respective commission percentage fees in the event IMALP were required in the future to repurchase the limited partner contracts. With agreement still unreached on portions of the total agreement, Rubin also sought to make alterations to the repurchase agreement and the operating deficit guarantee negotiated by Tucker Anthony and GBCD. The process was doubtless frustrating in the extreme to GBCD; on July 10 it reported to Tucker Anthony there were only two business terms in dispute, but by August, after Rubin had reviewed several successive drafts of the offering memorandum, the number of unsettled issues had risen to five. On August 3 Rubin rejected GBCD's advice to accept the Tucker Anthony deal "as negotiated and agreed to" (that is, by Tucker Anthony and GBCD); Rubin refused to concede the unresolved issues.

There was no evidence that Rubin was trying to sabotage the equity syndication.[26] Miller himself testified that Rubin worked as hard as he could to bring the Tucker Anthony deal to a successful conclusion and that many of Rubin's proposed changes in the offering memorandum made sense. The offering memorandum was, by August 5, a 166-page document (exclusive of lengthy exhibits), summarizing the project, its financing, the subscription agreement, the partnership agreement, the guarantees of the general partners (construction completion, repurchase, etc.), tax considerations, and financial forecasts. Rubin's habit of raising issues that could have been raised in earlier drafts may have been frustrating but was not bad faith when one considers that Rubin and Rahn bore all the financial risk of a failed project.

---

ment for a set amount of time to pay the amount, if any, by which the project's operating expenses and debt service payments exceed the project's income. A subordination agreement is an agreement to subordinate the receipt of the developer's fee to fund operating deficits not covered by project reserves. A construction completion guarantee is an agreement to pay amounts by which cost overruns exceed project reserves.

[26]Rubin and Rahn had nothing to gain from upsetting the equity syndication, the successful completion of which would enable them to recover roughly four million dollars of their own money that they had, through IMA, made available to the project. (IMA had no business other than to be a general partner in IMALP.)

The master's conclusion that the syndication deal with Tucker Anthony was functionally complete by July or early August, 1987, is not supported by the record; and his conclusion that Rubin acted in bad faith by revisiting issues previously settled was inconsistent with applicable law, and we are not bound by it. *Demoulas* v. *Demoulas Super Markets, Inc.*, 424 Mass. 501, 510 (1997).

Until all the issues were settled, there was no binding contract with Tucker Anthony. See *Tull* v. *Mr. Donut Dev. Corp.*, 7 Mass. App. Ct. 626, 632 (1979); *Schwanbeck* v. *Federal-Mogul Corp.*, 31 Mass. App. Ct. 390, 398 (1991), *S.C.*, 412 Mass. 703 (1992). "It is not enough if parties negotiating have agreed upon certain important terms if there has been no agreement on other essential elements of the undertaking . . . ." *Geo. W. Wilcox, Inc.* v. *Shell E. Petroleum Prod., Inc.*, 283 Mass. 383, 390 (1933) (citation omitted). In August, many essential business terms remained unresolved.[27] IMALP had a duty to neither Tucker Anthony nor GBCD to proceed sequentially to resolve each successive issue, never turning back to reopen issues previously settled. Until final agreement on all points, and the execution of a binding contract reflecting that agreement, resolutions of issues previously discussed must be regarded as tentative. "Before an enforceable agreement arises '[a]ll [its] essential terms . . . must be definite and certain so that the intention of the parties may be discovered, the nature and extent of their obligations ascertained, and their rights determined.' " *JRY Corp.* v. *Le-*

---

[27]The language of these terms, which were "not simple" even to experienced professionals in the syndication business, went through a number of permutations. Disputes arose between the defendants and Tucker Anthony over the following issues: (1) the events triggering the buy-back of the limited partner interests, (2) Tucker Anthony's requirement that the defendants reimburse the limited partners in excess of 100 percent of their investments (to cover the investors' "recapture" tax liability), (3) Tucker Anthony's request that Rubin and Rahn personally guarantee the costs of construction completion and the operating deficits (the engagement letter had required the general partners to fund construction completion costs), (4) the defendants' insistence on limiting the amount of exposure with respect to the construction completion guarantee (an unlimited guarantee is standard in affordable housing investments), (5) Tucker Anthony's request that pursuant to the subordination agreement, the defendants treat their payments as interest-free unsecured loans to be repaid last in the order of priority after a sale or refinance in the fifteenth year of the partnership, (6) the payment and rate of interest on money advanced by the defendants pursuant to the terms, and (7) the terms of the defendants' fee.

*Roux*, 18 Mass. App. Ct. 153, 172 (1984), quoting from *Cygan* v. *Megathlin*, 326 Mass. 732, 733-734 (1951).

The award to GBCD of $228,000 as the commission on the uncompleted syndication cannot stand.[28]

4. *The Investor Services Agency Fee.* Had the equity syndication taken place, the June, 1987, agreement would have engaged GBCD to handle investor services at a fee of $10,000 per year for eight years and $5,000 per year for eight more. Taking no account of the delay factor, the master awarded GBCD $120,000 for the lost fee, based on the same reasoning that underlay his award of GBCD's commission on the syndication. This award must fail for the same reason: IMALP's failure to consummate a contract for the syndication did not violate any duty of good faith it owed to GBCD or Tucker Anthony. The award would fail also for a second reason. An award of damages for breach of a contract to pay for services must take into account the cost to the plaintiff of rendering the services. Otherwise the award would result in a windfall. No evidence having been offered of that cost, any award of damages is speculative.

5. *Liability under G. L. c. 93A, § 11.* In their proposed findings of fact, the plaintiffs included findings to the effect that Rubin, at the time he signed the June, 1987, agreement with GBCD, had no intention of paying GBCD the fees to which Rubin was committing IMA and IMALP. Had the master adopted those findings, the finding of c. 93A liability would have stood on the solid basis of fraud. See *Homsi* v. *C.H. Babb Co.*, 10 Mass. App. Ct. 474, 478 (1980).

The master, however, struck those findings and rested his conclusion of c. 93A liability instead on several grounds which we interpret as independent rather than cumulative. One of these was that the defendants acted unfairly and deceptively in a course of conduct by which they took advantage, in effect, of the fact that no money was due to GBCD until GBCD was owed very substantial sums (i.e., until the MHFA loan closing)

---

[28]The master analogized GBCD's claim of its three percent commission on the equity syndication to the claim of a broker who has done all the work of finding a buyer agreeable to the seller's terms who is entitled to a commission if the seller then wrongfully refuses to go through with the sale. The decision on which the master relied, however, *Tristram's Landing, Inc.* v. *Wait*, 367 Mass. 622 (1975), made clear (at 629) that a broker's commission is not earned unless the prospective buyer enters into a binding contract with the seller, a point reinforced by *Capezzuto* v. *John Hancock Mut. Life Ins. Co.*, 394 Mass. 399, 402 (1985).

and then withheld payment unconscionably, stringing GBCD along in performing more services, but refusing substantial payments, all with a purpose of coercing GBCD to settle for substantially less compensation than the parties had agreed to before the services were performed.

The evidence, in our view, supported this construction of events. In advance of the MHFA loan closing, the defendants were required to certify that the project was in financial balance and that IMALP was able to meet the costs of the project, impliedly including the fee for GBCD's services as one of these costs. To make this showing (in November, 1987) IMA added more equity money to the project, raising its total to four million dollars, roughly twice the equity share that MHFA required, enabling IMALP to show MHFA over two million dollars in cash and letters of credit available to meet expenses. Despite those representations, when the MHFA loan closed the following month, triggering the payment time under the contract with GBCD, Rubin claimed that available funds were otherwise committed, and paid GBCD only $10,000 against a present obligation for already rendered services of $314,508.08. Responding to GBCD's demands for payment, Rubin raised specious defenses. He claimed that the contract required payment of a fee for the syndication consulting only if the equity syndication were successful. (This was true as to the three percent commission but plainly untrue as to the time charges.) He invoked the $35,000 and $55,000 caps on the development consultant fee that had expired many months (and hundreds of service hours) earlier, as well as a $155,000 cap that manifestly was not a cap at all but only an estimate made at a time when it was expected the MHFA loan would close months before it did. Rubin objected to the development consultant bill because it contained legal and accounting expenses that were related to the failed equity syndication. Miller resubmitted the bill with those charges deleted and still Rubin did not pay. In a memo from Rubin to Rahn about the same time (late March, 1988), Rubin stated his intention to cause GBCD to settle its entire development consulting claim, including its work in the future, for only $120,000, and to avoid paying the syndication consulting claim at all, particularly in light of a $160,000 claim by their previous development consultant which they *would* have to pay.

In response to Rubin's specious objections, GBCD, pressed to meet its own obligation, agreed to compromise the claim, as

we have seen, if IMALP would come up with $140,000 at specified dates spanning one month. Rubin took advantage of the concession, agreeing to meet the payment schedule, but immediately resumed stringing along GBCD. GBCD, diligently continuing its services as development consultant during this entire time, could reasonably have interpreted the days-late $40,000 installment, the weeks-late $50,000 installment, and the non-tendered final $50,000 installment as a return by Rubin to a pattern of stringing GBCD along, inducing it by promises of payment to continue to render services but failing to pay despite urgent demands and repeated unconditional promises of immediate or nearly immediate payment. Rubin's decision to encumber the final, unconditionally due, $50,000 payment, offered months late, with a restrictive endorsement that forced GBCD to choose between cashing it and giving up legitimate claims totaling — on the view most favorable to the defendants — more than $180,000, could reasonably be treated as confirming Rubin's intention to force GBCD to settle for far less than it had earned in fees.

On the master's findings this pattern of behavior amounted to more than mere non-payment of a debt, which would not normally justify a finding of c. 93A liability. *Levings* v. *Forbes & Wallace, Inc.*, 8 Mass. App. Ct. 498, 504 (1979). See *Whitinsville Plaza, Inc.* v. *Kotseas*, 378 Mass. 85, 100-101 (1979); *Massachusetts Employers Ins. Exch.* v. *Propac-Mass, Inc.*, 420 Mass. 39, 43 (1995). The pattern of the defendants' conduct towards GBCD was properly found to have exhibited "an extortionate quality," *Atkinson* v. *Rosenthal*, 33 Mass. App. Ct. 219, 226 (1992), that was more than tolerably unfair to GBCD and constituted a wilful effort to impair its right to receive the benefits of its contract with IMALP. The master could reasonably infer that Rubin and Rahn could have made the payments as called for by the agreement, if necessary from their own resources (their combined net worth exceeded $20 million), and that their foot dragging was intended to put pressure on GBCD to compromise its claim. Such conduct violated the implied covenant of good faith and fair dealing in GBCD's contract with IMALP, *Anthony's Pier Four, Inc.* v. *HBC Assocs.*, 411 Mass. at 473, and furnished a basis for c. 93A liability. *Id.* at 474. *Mass. Employers Ins. Exch.* v. *Propac-Mass, Inc.*, 420 Mass. at 43.

6. *Personal Liability of Rubin and Rahn.* The judge struck

findings by the master predicating personal liability of IMA's two principals on a promise, express or implied, that they would underwrite the project and, if necessary, pay IMALP's obligations to GBCD from their personal resources. Nevertheless, he left the master's finding of individual liability in place, basing it implicitly on the second ground given by the master, the personal participation of Rubin and Rahn in orchestrating IMALP's violation of the covenant of good faith and fair dealing and the pattern of unfair and coercive conduct towards GBCD.[29] It is settled that corporate officers may be held liable under c. 93A for their personal participation in conduct invoking its sanctions. See *Nader* v. *Citron*, 372 Mass. 96, 102-103 (1977); *Standard Register Co.* v. *Bolton-Emerson, Inc.*, 38 Mass. App. Ct. 545, 551 (1995). There was no error in holding Rubin and Rahn liable as individuals under c. 93A.

7. *Liability for the Seed-Money Note.* GBCD's charitable trust, it will be recalled, furnished $25,000 of seed money to the project, taking a note for that amount signed by one Jordan, then president of USSCDC. The trust's function was to lend money to non-profit groups dedicated to community renewal; the loan was intended to serve as part of USSCDC's capital contribution to the then unnamed partnership to be formed in the future. At that time GBCD was working exclusively for USSCDC.

The master found that the defendants who have appealed (i.e., IMALP, IMA, Rubin and Rahn) were liable to repay the $25,000, with interest, on a theory that IMALP was benefitted thereby and that the defendants were thus unjustly enriched. Unjust enrichment, as a basis for restitution, requires more than benefit. The benefit must be *unjust,* a quality that turns on the reasonable expectations of the parties. See *Salamon* v. *Terra*, 394 Mass. 857, 859 (1985). "[A] contracting party must look for payment to the one to whom credit was extended when the work was done, that is, the one who was expected to pay and who in fact expected to pay or as a reasonable man should have expected to pay." *LaChance* v. *Rigoli*, 325 Mass. 425, 427 (1950).

There was no unjust benefit to IMA or its shareholders. The trust knowingly entered into a loan agreement with a then asset-

---

[29]No argument is made by the defendants that it was error not to differentiate the liability of Rahn from that of Rubin, who formally acted (for IMA) as general partner of IMALP.

less corporation and did not look for or receive a guarantee from the IMA defendants. USSCDC (through its subsidiary, USSIMB) used the proceeds as part of its share of project development expenses, as a fifty percent general partner. It received in return a fifty percent equity interest in the project to which the trust, as its creditor, can look for reimbursement. See G. L. c. 109 § 28 (creditor's remedy to reach partner's interest in partnership). The trust's remedy for nonpayment lies solely against USSCDC and USSIMB and not against IMALP, IMA, Rubin, and Rahn.

## CONCLUSION.

For the reasons stated the judgment in favor of GBCD must be amended by reducing the actual damages that GBCD may recover against the defendants IMALP, IMA, Rubin, and Rahn from $634,178.65 to $286,178.65.[30] These are subject to doubling under G. L. c. 93A to $572,357.30.

The IMA defendants have not separately challenged the award of attorneys' fees, $637,933.62. Nevertheless, because the size of the recovery is one of the factors normally considered in setting appropriate attorneys' fees, *Darmetko* v. *Boston Hous. Authy.*, 378 Mass. 758, 765 (1979), and the recovery in this case, exclusive of attorneys' fees, has been reduced on appeal by more than half, it is appropriate, on remand, for the judge to reconsider the award of attorneys' fees in light of the master's findings thereon and the result of the appeal.

The judgment for the trustees of Community Builders Charitable Trust is vacated as to the defendants IMALP, IMA, Rubin, and Rahn, and judgment is to be entered for those defendants. The judgment for Community Builders, Inc., is to be modified in accordance with this opinion, by reducing the awards of actual damages, c. 93A damages, and interest. Attorneys' fees are to be redetermined.

*So ordered.*

---

[30]Consisting of $155,900.02 for unpaid development consultant fees and expenses and $130,278.63 for equity consultant time-based fees.