# United States Court of Appeals
## For the First Circuit

No. 02-1494

THE BOSTON PILOTS; ARTHUR WHITTEMORE, CAPTAIN; L.J. CANNON;
R.B. EMERY; R. STOVER; J. COLLINS; C. HOYT;
J.S. CARMODY; R.P. CUSHMAN; J.E. FRYE, JR;
R.G. CORDES; F. MORTON; G.H. FARMER,

Plaintiffs, Appellants,

v.

THE MOTOR VESSEL MIDNIGHT GAMBLER AND
EAST COAST EXCURSIONS, INC.,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. George A. O'Toole, Jr., U.S. District Judge]

Before

Selya, Circuit Judge,
Coffin, Senior Circuit Judge,
and Lipez, Circuit Judge.

Michael J. Rauworth with whom Cetrulo & Capone LLP was on
brief for appellants.
Seth S. Holbrook with whom Holbrook & Murphy was on brief for
appellees.

February 10, 2004

**COFFIN**, **Senior Circuit Judge**. The Boston Pilots, an unincorporated association of licensed marine pilots, appeal from a ruling denying them recovery under the Massachusetts Consumer Protection Act, Mass. Gen. Laws ch. 93A. The Pilots contend that the effort and expense incurred in collecting pilotage fees owed by the appellees - the marine vessel *Midnight Gambler* and its operator, East Coast Excursions - stemmed from dilatory conduct by East Coast that ran afoul of ch. 93A's proscription against "unfair or deceptive acts or practices in the conduct of any trade or commerce," Mass. Gen. Laws ch. 93A, § 2. Although the conduct of East Coast is questionable, we find no clear error in the district court's determination that such behavior does not warrant sanction under ch. 93A.

The district court, sitting in admiralty under 28 U.S.C. § 1333, resolved the underlying fee dispute on summary judgment and awarded fees to the Pilots in a total amount of $60,768.06. The Pilots prevailed on two separate motions for summary judgment, the first for fees due for pilotage services actually rendered during August and September 1999, and the second for pilotage fees due for October and November of that same year, when East Coast claimed the *Midnight Gambler* was no longer required to carry pilots because of a revision in the ship's tonnage.

A bench trial on the ch. 93A claim followed the second summary judgment order, and the district court held that East Coast and the

*Midnight Gambler* would not be subject to additional penalties under the consumer protection statute. The court denied the Pilots' claim for attorney's fees as well as other costs, expenses and interest, allowed under Mass. Gen. Laws ch. 231, § 6F for frivolous or vexatious litigation. The Pilots appeal these orders as well as denial of their post-trial motion to reconsider. Neither side appeals the judgments awarding pilotage fees.

## I. **Background**

The dispute between the Pilots and East Coast arose over the obligation of every foreign flag vessel of 350 tons or more to carry a commissioned pilot while operating in Commonwealth waters. See Mass. Gen. Laws ch. 103, § 19. According to an International Tonnage Certificate registered with Lloyd's Register of Shipping, the *Midnight Gambler*, a Panamanian flag ship that made daily gambling cruises, weighed 372 gross tons.

The *Gambler* grumbled about the statutory pilotage requirement. East Coast President Dan Teitel testified that he was surprised the statute applied to the vessel because of its relatively small size (109 feet in length) and the brevity of its excursions. Teitel also noted that he was aware of no other port making such requirements of casino vessels traveling in and out of the same port each day, regardless of the ship's foreign flag. Nevertheless, East Coast duly carried a pilot for each of the *Gambler*'s voyages in August and September 1999.

Unfortunately, the pilot's daily fees exceeded the *Gambler*'s profits. Teitel contacted a Boston admiralty attorney who suggested it might be possible to re-estimate the tonnage of the vessel. Based on this suggestion, Teitel contacted a naval architect, who in turn procured a "Statement of Tonnage" from the American Bureau of Shipping.[1]

The parties no longer dispute the fact that the new Statement of Tonnage, listing "regulatory tonnage" for the *Midnight Gambler* at 314 tons, was never a valid replacement for the official international tonnage certificate. Teitel, however, testified that when he received the Statement, he did not understand - and as a lay businessman, not an admiralty expert, could not have understood - that this re-measured tonnage was simply hypothetical and did not change *Midnight Gambler*'s tonnage for purposes of the mandatory pilotage statute. Maintaining that the vessel was no longer above the applicable tonnage for the pilotage statute, he contacted Captain Arthur Whittemore, then President of the Boston Pilots, and told him the *Gambler* would no longer be carrying pilots.

---

[1]The process of computing vessel tonnage is referred to as "admeasurement." The "re-estimation" of vessel tonnage involves admeasuring the vessel under a different set of tonnage regulations. In the instant case, the *Midnight Gambler*'s valid Certificate of Tonnage was issued under international tonnage regulations. The ABS naval engineer performed the admeasurement for the Statement using United States regulations; because the calculation involved a contrary to fact assumption that the *Gambler* was under United States flag, the Statement could not be used to alter the vessel's tonnage for purposes of the Massachusetts statute.

The Pilots, however, objected and after unsuccessfully demanding payment for services already rendered,[2] brought an action *in rem* against the vessel and *in personam* against East Coast. As a result, the vessel was arrested in November by the U.S. Marshal Service. Although East Coast recovered the vessel after posting a surety bond, it ceased operations in the face of impending litigation.

As noted above, the district court ordered payment of pilotage fees for the duration of the time the *Midnight Gambler* was in operation. It rejected, however, the Pilots' request for damages based on unfair conduct under ch. 93A, and also rejected claims for attorney's fees and related costs and expenses under Mass. Gen. Laws ch. 231, § 6F. In this appeal, the Pilots contend that appellees' conduct warranted both damages and an award of attorney's fees, costs and interest.

## II. The Pilots' Chapter 93A Appeal

In analyzing a district court's disposition of a ch. 93A claim following a bench trial, we review findings of fact for clear error and conclusions of law *de novo*. Saint-Gobain Indus. Ceramics, Inc. v. Wellons, Inc., 246 F.3d 64, 73 (1st Cir. 2001). While the determination of whether a particular set of acts is unfair or deceptive is a question of fact, "the boundaries of what may

_____

[2]East Coast paid only for the first week of pilotage fees due for August and September.

-5-

qualify for consideration as a ch. 93A violation is a question of law." Commercial Union Ins. Co. v. Seven Provinces Ins. Co., 217 F.3d 33, 40 (1st Cir. 2000)(internal citations omitted).

The Pilots' claim for recovery under ch. 93A rests on two primary grounds. First, they contend that the American Statement of Tonnage was obtained as a pretext to evade an indisputable statutory obligation and to delay the inevitable day of reckoning. The Pilots argue it was inexcusable for East Coast to continue to resist the Pilots' claims after learning that the Statement had no validity. Second, the Pilots argue that the attempts by East Coast to settle the case for an amount less than what was due were tantamount to commercial extortion. The Pilots cite clear error in the district court's factual findings that the Statement of Tonnage was not deceptive and that East Coast lacked the ability to pay the pilotage fees. In addition, the Pilots urge us to conclude that the district court failed to apply the law properly.

We address first the court's factual findings and then consider whether the alleged conduct falls within the ambit of ch. 93A.

## A. Findings of Fact

**The Statement of Tonnage**. The district court's conclusion that the Statement was not deceptively generated is generally supported by Teitel's trial testimony. Teitel learned of the re-measurement process from an admiralty attorney, suggesting that it

was at least a plausible option. Although the American Bureau of Shipping engineer testified that a cover letter included with the Statement specified the measurement was merely hypothetical, Teitel explained that only a copy of the Statement, not the cover letter, was forwarded to him by the naval architect, who was his liaison with the Bureau. Furthermore, Teitel testified that only after the ship was arrested did he begin to doubt the Statement's validity. Moreover, although East Coast's purpose in securing the Statement was undoubtedly to circumvent a statutory obligation, we do not see that its initial reliance on the new measurement was entirely baseless. Though dubious, even the Pilots did not dismiss the Statement outright; at trial Captain Whittemore admitted that there was sufficient uncertainty surrounding its validity to warrant a non-judicial hearing on the subject by the Pilots.

The district court's apparent acceptance of Teitel's testimony as sincere is entitled to deference, see Deguio v. United States, 920 F.2d 103, 106 (1st Cir. 1990)("It is normally within the exclusive province of the trier to make determinations regarding witnesses' credibility.")(citing Anderson v. Bessemer City, 470 U.S. 564, 575 (1985)), and we thus find no clear error in the district court's finding that the Statement was not a deceptive act.[3]

---

[3]The district court suggested that even if the Statement was an attempted deception, it did not merit sanction under ch. 93A because from the outset the Pilots doubted its validity. We do

The Pilots contend that the district court's conclusion does not dispose of the issue; even if it was not deceptive, the Pilots argue the Statement was nevertheless an unfair pretext. We agree that the analysis of unfairness has a somewhat different substantive thrust than that of deception. See Cambridge Plating Co. v. Napco, Inc., 85 F.3d 752, 769 (1st Cir. 1996)("Chapter 93A liability may exist if the defendant's conduct falls within at least the penumbra of some common-law, statutory or other established concept of unfairness or is immoral, unethical, oppressive or unscrupulous.")(internal citations omitted). However, the evidence before the district court - namely, East Coast's initial genuine mistake regarding the validity of the admeasurement performed by ABS - equally supports the conclusion that procuring the Statement was not unfair.

**Inability to Pay**. Teitel explained that the *Gambler* venture was not turning a profit, and thus there was no money from which the pre-September pilotage fees could be paid.[4] The Pilots countered that once a bond sufficient to satisfy the debt was posted, there could be no defense of lack of funds. Teitel, however, noted that the bond required only that East Coast put up

---

not, however, endorse the general proposition that an unsuccessful ruse can never rise to a culpable level of deception under ch. 93A.

[4]Teitel explained that East Coast, if given some time to grow the business, expected that the venture, if free from the burden of pilotage fees, could over the long run become profitable.

$800 cash; the rest was secured against the boat.  Throughout the trial, Teitel stuck to his story that delayed payment was due to lack of funds, not strategic foot-dragging.

In light of this testimony and the deferential standard of review, we affirm the district court's findings.

## B.  <u>East Coast's Conduct Did Not Violate Chapter 93A</u>

The Pilots assert that even if the Statement of Tonnage was not deceptive and East Coast lacked the ability to pay the full amount of its debt, ch. 93A liability nevertheless should have been imposed because East Coast's settlement conduct amounted to commercial extortion.  In particular, the Pilots point to East Coast's refusal to pay coupled with repeated settlement offers below the total amount claimed by the Pilots.  The district court disagreed, characterizing East Coast's conduct as "simple failure to pay a debt."  <u>See</u>, <u>e.g.</u>, <u>Quaker State Oil Ref. Corp.</u> v. <u>Garrity Oil Co.</u>, 884 F.2d 1510, 1513 (1st Cir. 1989)(merely withholding funds and countersuing does not give rise to liability under ch. 93A).  According to the district court, East Coast's refusal to pay the invoices was neither an effort to gain unfair advantage nor an attempt to force an unconscionable settlement.

The precise contours of ch. 93A liability have remained somewhat undefined, despite frequent litigation.  <u>See</u>, <u>e.g.</u>, <u>Cambridge Plating Co.</u>, 85 F.3d at 769 ("Perhaps by design, the dimensions of Chapter 93A liability are difficult to discern with

-9-

precision."); Levings v. Forbes & Wallace, Inc., 8 Mass. App. Ct. 498, 503 (1979)("What is unfair is a definitional problem of long standing, which statutory draftsmen have prudently avoided."). To guide our scrutiny of the context and course of dealing, "we focus on the nature of challenged conduct and on the purpose and effect of that conduct as the crucial factors in making a G.L. 93A fairness determination." Commercial Union Ins. Co., 217 F.3d at 40 (quoting Massachusetts Employers Ins. Exch. v. Propac-Mass, Inc., 420 Mass. 39, 648 N.E.2d 435, 438 (1995)).

The Pilots claim that East Coast effectively sought a discount on an indisputably due trade debt. See Arthur D. Little, Inc. v. Dooyang Corp., 147 F.3d 47, 55-56 (1st Cir. 1998)(affirming that an attempt to "extract a favorable settlement . . . for less than the amount . . . owed by repeatedly promising to pay, not doing so, stringing out the process, and forcing [the other party] to sue" violated ch. 93A); Community Builders, Inc. v. Indian Motorcycle Assoc., Inc., 44 Mass. App. Ct. 537, 559, 692 N.E.2d 964, 979 (1998)(finding that defendant's "foot dragging was intended to put pressure on [plaintiff] to compromise its claim").

The context in which the settlement overtures were made, however, is important. Each offer occurred before the district court had rendered either of its two summary judgment orders and was in an amount greater than what was owed for the first portion of disputed pilotage fees, namely, those due for August and

September services.  The offers also occurred before East Coast's concession regarding the Statement of Tonnage.  Even if, at the time the offers were made, the August and September pilotage was indisputably due, liability for the October and November pilotage was yet to be determined.  Thus the offers were not objectively inadequate.

In a similar vein, East Coast's refusal to pay was neither a "wedge" to gain advantage in an on-going commercial relationship, see Pepsi-Cola Metro. Bottling Co. v. Checkers, Inc., 754 F.2d 10, 18 (1st Cir. 1985), nor a coercive act inviting increasingly detrimental reliance by the Pilots on hollow assurances to pay.  In both Arthur D. Little and Community Builders, relied on by the Pilots, additional services were wrested from the aggrieved party through such false promises.  See Arthur D. Little, Inc., 147 F.3d at 56; Community Builders, 44 Mass. App. Ct. at 559, 692 N.E.2d at 978.  While East Coast bitterly resisted the Pilots' effort to collect, it did not parlay its indebtedness into a strategic advantage.  See Framingham Auto Sales, Inc. v. Workers' Credit Union, 41 Mass. App. Ct. 416, 418, 671 N.E.2d 963, 965 (1996)("Mere resistance to a just claim is not the stuff of c.93A.").  Although East Coast had dropped its reliance on the Statement of Tonnage by the time the court heard oral argument on the Pilots' first motion for summary judgment, it continued to pursue its defense on other

-11-

grounds, including the method of calculating fees and the Pilots' standing.

The Pilots rely heavily on R.W. Granger & Sons, Inc. v. J&S Insulation, Inc., 435 Mass. 66, 754 N.E.2d 668 (2001), in which a surety company was found to have violated ch. 93A by resisting an already adjudicated claim and making a "manifestly inadequate" offer of settlement. 435 Mass. at 72, 754 N.E.2d at 676. The district court distinguished Granger in a footnote, explaining that in that instance, liability was in part predicated on violations of Mass. Gen. Laws ch. 176D, which prescribes a standard of conduct for insurance companies.

The Pilots correctly point out that Granger also affirms ch. 93A liability on grounds independent of ch. 176D. The Granger court, however, relied on conduct that occurred after judgment had been entered against the surety. As noted above, East Coast's settlement offers preceded the liability rulings. Although in retrospect, East Coast's likelihood of success was slim, we decline to override the trier's findings of fact and use this as the basis for a ch. 93A violation. See Quaker State Oil Ref. Corp., 884 F.2d at 1514 ("Whether or not the counterclaims now appear futile, Garrity had the right to test them through litigation.").

The Pilots fare no better by relying on Anthony's Pier Four, Inc. v. HBC Assoc., 411 Mass. 451, 583 N.E.2d 806 (1991). In Anthony's Pier Four, a developer relied on what appeared to be

objective approval by the real estate owner of both the terms of the contract and changes to the development plan made over the course of the project. Millions of dollars and years of effort were suddenly endangered when the owner willfully breached the contract because he "'made a lousy deal' . . . 'and . . . had to get more money to be satisfied.'" Anthony's Pier Four, 411 Mass. at 460, 583 N.E.2d at 814. Though the Pilots attempt to argue that East Coast engaged in a similarly reprehensible manner, we do not agree. The distinction rests in part on a matter of degree. The harm suffered in cases relied on by the Pilots was compounded by deceptive or unfair behavior that prevented - or at a minimum diverted - the injured parties from seeking immediate redress. See also Arthur D. Little, 147 F.3d at 51 ("Dooyang repeatedly promised to pay the outstanding . . . invoices, though it had no intent to do so."); Community Builders, Inc., 44 Mass. App. Ct. at 557 ("Rubin, at the time he signed the June, 1987, agreement with GBCD, had no intention of paying GBCD the fees to which Rubin was committing.").

While we think East Coast's behavior treads close to the line between a sharp-edged business tactic and an unfair subterfuge, we ultimately conclude that application of the law to the facts as found by the trial court does not give rise to liability under ch. 93A.

### III. Motion for Costs, Expenses and Interest under Mass. Gen. Laws ch. 231, § 6F

The district court summarily denied, without opinion, the Pilots' motion for interest, costs and expenses, including attorney's fees, under Mass. Gen. Laws ch. 231, § 6F. Section 6F permits recovery if "all or substantially all" of a party's claims or defenses are "wholly insubstantial, frivolous and not advanced in good faith." Appeal is provided for under Mass. Gen. Laws ch. 231 § 6G, which directs the reviewing court to examine the finding and award, if any, "as if it were initially deciding the matter." See Hahn v. Planning Bd. of Stoughton, 403 Mass. 332, 336, 529 N.E.2d 1334, 1337 (1988)(reviewing *de novo* an appeal of a motion made under § 6F).

The Pilots ground their motion on East Coast's opposition to the Pilots' summary judgment motions, charging that reliance on the Statement of Tonnage was a meritless defense. We think, however, that East Coast was entitled to test its theory through the summary judgment phase.[5] Aside from the mistaken reliance on the Statement of Tonnage, East Coast disputed the calculation of fees, the Pilots' standing, and the ability of the Pilots to recover the October and November fees based on the Pilots' own threats to withhold services owing to the outstanding debt for August and

---

[5]We note that East Coast did not appeal the district court's summary judgment orders, which almost certainly would have been a vexatious extension of this litigation.

-14-

September pilotage.  Though ultimately unavailing, East Coast's efforts were supported by a marginally colorable foundation and thus not wholly insubstantial or frivolous.

We reach a similar conclusion on the issue of good faith.  In Massachusetts, good faith implies "an absence of malice, an absence of design to defraud or to seek an unconscionable advantage."  Hahn, 403 Mass. at 337, 529 N.E.2d at 1331.  We agree with the district court that the conduct here does not reflect malicious or fraudulent malfeasance that justifies an award under § 6F.  See Police Comm'r of Boston v. Gows, 429 Mass. 14, 19, 709 N.E.2d 1126, 1129 (1999)("An award of attorney's fees should be reserved for rare and egregious cases.").  Moreover, for reasons similar to our conclusion that East Coast did not pursue a strategy of commercial extortion, see infra at 9-12, we also conclude there was no effort to seek unconscionable advantage.

Affirmed.  Each party shall bear its own costs.