# United States Court of Appeals
## For the First Circuit

Nos. 07-1743
     07-1744

MURALI JASTY, M.D.,

Plaintiff, Appellee/Cross-Appellant,

v.

WRIGHT MEDICAL TECHNOLOGY, INC;
WRIGHT MEDICAL GROUP, INC.,

Defendants, Appellants/Cross-Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
[Hon. George A. O'Toole, Jr., U.S. District Judge]

Before

Howard, Circuit Judge,

Wolf,[*] District Judge,

and Besosa,[**] District Judge.

James L. Beausoleil, Jr., with whom Anthony L. Gallia, Duane
Morris LLP, and Darlene D. Moreau were on brief, for appellants.
     Joanne D'Alcomo, with whom Howard P. Blatchford, Jr. and Jager
Smith P.C. were on brief, for appellee.

June 5, 2008

[*]Of the District of Massachusetts, sitting by designation.

[**]Of the District of Puerto Rico, sitting by designation.

**HOWARD**, **Circuit Judge**.    Appellants Wright Medical Technology, Inc. and Wright Medical Group, Inc. (collectively, "Wright") challenge the district court's summary judgment ruling that Wright breached its contract with Dr. Murali Jasty, as well as the district court's refusal to consider newly submitted facts on review of the report and recommendation of a magistrate judge. Jasty's cross-appeal challenges the district court's summary judgment ruling that Wright did not violate state consumer protection statutes.    Jasty also challenges the district court's decision not to compel a Wright expert to testify, as well as the court's choice of law ruling with respect to the calculation of prejudgment interest on a damages award.    We affirm the district court across the board.

## I.  Facts.

### A.  Background.[1]

Tennessee-based Wright Medical Technology, Inc. designs, manufactures and markets orthopedic implant devices.    Dr. Murali Jasty, an orthopedic surgeon associated with Massachusetts General Hospital, was one of a group of surgeons nationwide whom Wright engaged to act as consultants and to help Wright develop and commercialize a new artificial knee system, the "ADVANCE® Knee." In March 1995 Wright entered into a written contract with Jasty.

---

[1]This recitation is based on the record accepted by the district court.  We address in the next section the district court's ruling striking certain evidence offered by Wright.

Under the contract, Wright agreed to compensate Jasty for providing a variety of services in support of the development of the Advance Knee.

Jasty's responsibilities, as set forth in the first paragraph of the contract, were to "act as a designer, product spokesperson and consultant." He agreed to provide Wright with "services and expertise" including but not limited to:

(a) Current clinical design or other experience with total knee systems . . . (b) Time away from [his] practice necessary to participate in clinical consultant meetings and/or technical meetings . . . (c) Time necessary to review and co-author papers and publications . . . (d) Time necessary to develop product educational information . . . (e) . . . [R]eview[ing] clinical data and mak[ing] oral presentations to peer groups, regulatory agencies and the general public as required . . . [and] (f) . . . [P]rovid[ing], at Wright's request, regular written activity reports.

Compensation was to take three different forms: 1) a flat payment, for the period November 1, 1994 through November 1, 1999, of $145,000 per year; 2) royalty payments for ten years based on sales of the Advance Knee; and 3) specified payments on the date of and subsequent anniversaries of Wright's initial public offering ("IPO"), should Wright become a publicly traded company. The $145,000 annual payment for the period November 1994 to November 1999 was expressly designated as payment "in return for the above services," that is, those set out in the first paragraph. The contract further specified with respect to that annual payment, "Payment of this sum is to compensate you for spending time away

-3-

from your practice to provide such services and consultations to [Wright] during that period as well as to compensate you for your design input and the rights to commercialize . . . your rights to inventions currently under patent."  After November 1999, "all payments for services under this Agreement shall be pursuant to paragraph 2.b. (and paragraph 2.d. if applicable)."  Paragraphs 2.b. and 2.d. provide for the royalty and IPO payments.  The contract also provided for an offset:  should royalties based on sales be payable prior to November 1, 1999, the annual payments would be reduced by the amount of the royalty payments.

Under the royalty provision, Jasty would be entitled to royalties "[w]hen a component of the Products results from these collaborative efforts for which you have contributed significant design input."  Royalties were to be paid quarterly for ten years, based on a specified percentage of net sales.  This provision contains no language about Jasty's services or any other conditions, other than the requirement that Jasty must have contributed "significant design input."

The IPO compensation provision establishes cash payments if Wright were to become a public company.  The first payment of $100,000 would be made at the time of the IPO.  Later payments of $50,000 each were to be made on the first two anniversaries of the IPO date, with another payment of $100,000 to be made on the third anniversary.  The IPO payments were to be triggered only if Jasty

-4-

was "continuing to perform consulting services to [Wright] under this agreement at the time of payment, unless such nonperformance is due to death or disability".

Under the contract's termination provision, termination for cause may be by either party on thirty days written notice and after an opportunity to cure. The contract could also be terminated for cause without written notice and opportunity to cure for failure to comply with paragraph 5, the contract's exclusivity provision. That provision prohibited Jasty from working on competitor products. Additionally, the contract contained an as-of-right termination provision for Jasty: on November 1, 1999, Jasty would become free to terminate the contract.

It is undisputed that Jasty contributed to the development of the Advance Knee and was eligible for royalties.[2] He began receiving royalty payments under the contract in the second quarter of 1995. Wright also made all of the required $145,000 annual payments to Jasty between November 1994 and November 1999.

The first sign of trouble in the consulting relationship appeared in October 1998. Wright's then-President and CEO Tom

---

[2]We understand the magistrate judge's report and recommendation to find as an undisputed fact that Jasty was eligible for royalties based on his initial contribution of "consulting and significant design input." Wright appears to misapprehend this finding as a statement that Jasty's ongoing contributions were undisputed. Wright makes no argument, though, that Jasty's initial contribution was insufficient to render him eligible for royalties.

Patton traveled to Boston to meet with Jasty to discuss Jasty's work. Patton testified in his deposition that he informed Jasty of Wright's dissatisfaction with his performance and that his contract would be terminated if he did not conform his performance to expected standards.

Contemporaneously, Patton sent Jasty a letter purporting to summarize the meeting. In the letter, Patton stated, "I am glad we had the opportunity to meet last week and discuss your ongoing role with our business." The letter also mentioned Patton's intention to "reduce our discussions to writing."

The letter continued: "[O]n-going promotional, marketing and scientific services from you are critical to the success of the Advance Knee, have always been contemplated by our agreement, and provide the basis for continued payments under our contract." The letter stated that Patton and Jasty "agreed that it was important for [Jasty] to do" the following: "use the Advance Knee in the majority of your knee cases," "host surgeons for surgical demonstrations," "develop published studies from your lab" and "make yourself more readily available to speak." In the letter, Patton also expressed the view that Jasty's work in developing and promoting a competing product was "unacceptable."

The letter contained no threat of termination. It did not state that Wright considered Jasty in breach of the contract, nor did it mention a thirty-day time frame or an opportunity for

-6-

Jasty to cure. The letter did advise Jasty that Wright personnel would contact him regarding specific projects.

Almost three years later, in September 2001, Wright terminated Jasty's contract via a letter from Wright's Senior Vice President, Glen Coleman. That letter stated, "[t]his situation was brought to your attention during a meeting with Tom Patton in October 1998. Since that time, improvement has not been made . . . . we believe it is appropriate to . . . end the current consulting agreement." The letter contained a settlement offer of royalty payments through the end of 2002. In a March 2002 letter, Wright retracted the settlement offer and stated that royalty payments had ceased as of the end of 2001.

At this point, Wright had been paying royalties to Jasty under the contract since 1995. In addition, Wright became a public corporation in July 2001, and Jasty received $100,000 pursuant to the IPO provision in the contract. As of the end of 2001, Jasty had received annual payments of $145,000 for the years between 1994-1999, the $100,000 payment at the time of the July 2001 IPO, and royalty payments based on sales of the product from 1995 through the last quarter of 2001.

**B. Procedural History.**

Jasty filed suit against Wright in Massachusetts state court. In his June 2003 amended complaint, he claimed that Wright

breached the contract and violated the Massachusetts and Tennessee consumer protection statutes, Mass. Gen. Laws ch. 93A and Tenn. Code Ann. § 47-18-01.[3]  Wright timely removed the case to federal court and counterclaimed on three issues:  1) breach of contract; 2) breach of the implied covenant of good faith and fair dealing; and 3) the above-mentioned state consumer protection statutes.

The parties each sought summary judgment.  A magistrate judge recommended that partial summary judgment be granted to Jasty on his breach of contract claim, as well as summary judgment on his opposition to Wright's three counterclaims.  As to Wright's cross-motion for summary judgment on all of Jasty's claims, the magistrate judge recommended awarding summary judgment to Wright on Jasty's consumer protection claims and the other claims not on appeal.

Wright objected to the magistrate judge's report, as permitted by 28 U.S.C. § 636(b).  As part of the objection, Wright included a number of exhibits, many of which had not been before the magistrate judge.  The district judge adopted the magistrate judge's report in its entirety, while striking the portion of Wright's objection that relied on the new evidence.

Following the summary judgment rulings, a separate jury trial was held on damages, and Jasty was awarded approximately $2.5

---

[3]Jasty's other claims (quantum meruit, fraud and/or misrepresentation and unjust enrichment) are not at issue in this appeal.

million in damages.  As requested by Wright, however, the district court determined that Tennessee law on prejudgment interest would apply, rather than Massachusetts law.

On appeal, Wright challenges both the district court's resolution of the breach of contract claim and the district court's failure to consider the new evidence submitted by Wright.  Jasty cross-appeals from the district court's denial of his consumer protection claims.  Jasty also challenges the district court's decision not to compel a Wright expert to testify, as well as the district court's choice of law determination regarding the appropriate prejudgment interest rate.

## II.  Wright's Appeal.

### A.  Newly-Submitted Evidence.

We review the district court's decision not to consider evidence on summary judgment for an abuse of discretion.  See Desrosiers v. Hartford Life & Acc. Co., 515 F.3d 87, 91 (1st Cir. 2008).  That is to say, we will not set aside a decision by the district court without "a definite and firm conviction that the court below committed a clear error of judgment in the conclusion it reached upon a weighing of the relevant factors."  Hoffman v. Applicators Sales & Serv., Inc., 439 F.3d 9, 14 (1st Cir. 2006).

Wright argues that the district court abused its discretion in striking the newly-submitted evidence when it ruled on Wright's objection to the magistrate judge's report.  Wright had

-9-

objected to the magistrate judge's finding that Wright did not provide sufficient notice to Jasty that it considered Jasty in breach.

Wright first says that the district court erred in misapprehending its ability to consider newly submitted evidence. Under 28 U.S.C. § 636(b), a district court reviewing a magistrate judge's report and recommendation has discretion whether to receive further evidence.

> A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

28 U.S.C. § 636(b) (emphasis added). Wright points to the district court's statement in ruling to strike the evidence: "In the absence of special circumstances, review of a Magistrate Judge's Report and Recommendation should be limited to the record considered by the Magistrate Judge. . . . Special circumstances do not exist here." While this statement may not be a verbatim recitation of section 636(b), it suffices to show that the court understood the standard -- that it was not required to receive further evidence but rather possessed discretion in the matter.

The magistrate judge's report concluded that there is "no evidence that Wright ever communicated its continuing

-10-

dissatisfaction to Jasty after [] October 1998" (emphasis added). In support of its contention that the district court thus should have considered additional evidence of Jasty's ongoing failure to perform, Wright has massaged the language of the magistrate judge's observation, arguing that Wright was not under an obligation to "continually" notify Jasty that he was not performing under his contract. Wright is correct on this point, strictly speaking, but its argument misses the mark. The magistrate judge had determined, not that Wright needed to repeatedly provide notice, but rather that the October 1998 letter by itself did not provide the required notice and that Wright did not later advise Jasty of its continuing dissatisfaction. The magistrate judge did not intimate that Wright had a duty to continually complain to Jasty. Moreover, the issue was notice, and evidence about whether Jasty sufficiently performed under his contract after October 1998 was not probative on that

issue.[4]  We conclude that the district court did not abuse its discretion in declining to consider the new evidence.

Wright initially filed a brief in this court that relied on but did not identify the excluded evidence.  Jasty requested sanctions.  First Circuit Local Rule 38.0 authorizes sanctions for "vexatious litigation," where a party or attorney "files a motion, brief, or other document that is frivolous or interposed for an improper purpose, such as to harass or cause unnecessary delay, or unreasonably or vexatiously increases litigation costs."  Wright's decision to incorporate the stricken evidence into its briefs without identification as such was inappropriate, but we do not conclude that it was vexatious.  See Cruz v. Savage, 896 F.2d 626, 631-32 (1st Cir. 1990) (in context of 28 U.S.C. § 1927, "vexatious" behavior understood as conduct displaying a "serious and studied disregard for the orderly process of justice") (internal quotation marks and citation omitted).

_____

[4]Wright attempted to introduce twenty-nine exhibits, consisting of deposition testimony from Wright personnel, correspondence between Wright personnel and Jasty, and internal Wright memoranda. The deposition testimony described, inter alia, Wright's expectations after October 1998 for Jasty's continued services to Wright under the contract.  The correspondence included post-October 1998 invitations to Jasty regarding courses, seminars, and speaking engagements, and queries from Wright to Jasty about specific studies or surgeries that Jasty had conducted.  The internal memoranda included post-October 1998 records of Jasty's attendance and participation at various Advance Knee-related meetings and in Advance Knee-related laboratory and clinical studies.  None of the exhibits, however, were related to the question of whether, between October 1998 and September 2001, Wright communicated dissatisfaction with Jasty's performance to Jasty himself.

**B.  Breach of Contract.**[5]

Our review of the district court's rulings on summary judgment is de novo, OneBeacon Am. Ins. Co. v. Travelers Indem. Co., 465 F.3d 38, 41 (1st Cir. 2006), keeping in mind that summary judgment is appropriate where no genuine issue of material fact exists and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).[6]

Wright challenges the grant of summary judgment to Jasty on the breach of contract claim.  Wright argues that:  1) summary judgment is inappropriate because the contract is ambiguous as to whether Jasty had an obligation under the contract to provide services to Wright after November 1, 1999; 2) Wright provided the required written notice of its intent to terminate the contract through the meeting and letter of October 1998; and 3) Wright had

---

[5]Because there are no relevant differences between Massachusetts and Tennessee law on the substance of the claims here, we decline to decide which is controlling and use Massachusetts case law for simplicity.  See Okmyansky v. Herbalife Intern. of Am., Inc., 415 F.3d 154, 158 (1st Cir. 2005) (when a choice of law determination would not alter the disposition of a legal question, a court need not decide which body of law controls.)  We review the district court's choice of law determination only as to the calculation of prejudgment interest.

[6]We note that, as the district court did not abuse its discretion in declining to accept Wright's newly offered evidence, neither will we consider that evidence for purposes of reviewing the summary judgment ruling.  See APG, Inc. v. MCI Telecommunications Corp., 436 F.3d 294, 297 n.1 (1st Cir. 2006) (review of summary judgment rulings is limited to the record at the time of the district court's decision); see also Hoffman, 439 F.3d at 14 (same).

not waived its ability to argue that Jasty had breached the contract by continuing to pay Jasty through 2001.

Wright first argues that the contract is ambiguous as to whether Jasty was obligated to provide services after November 1999, and thus the breach claim should not have been resolved on summary judgment. "A contract is ambiguous if an agreement's terms are inconsistent on their face or where the phraseology can support reasonable differences of opinion as to the meaning of the words employed and obligations undertaken." Nicolaci v. Anapol, 387 F.3d 21, 26 (1st Cir. 2004) (citing Lohnes v. Level 3 Communications, Inc., 272 F.3d 49, 53 (1st Cir. 2001)) (internal quotation marks omitted) (applying Massachusetts law). The meaning of terms in an ambiguous contract is often considered a fact question reserved for a jury. Nadherny v. Roseland Property Co., 390 F.3d 44, 48 (1st Cir. 2004). Here, the district court found the contract unambiguous and concluded that Jasty was not required to provide services to Wright under the contract after November 1, 1999 in order to receive royalty payments.

Wright points to the agreement's paragraph 2.a. in support of its argument that the contract is ambiguous. This paragraph provides that after cessation of the annual payments on November 1, 1999, "all payments for services . . . shall be pursuant to paragraph 2.b. (and paragraph 2.d. if applicable)." One reading of this language is that the contract requires Jasty's

-14-

provision of services after November 1999 in order for him to continue to be eligible for _any_ payments:  royalties under paragraph 2.b. and IPO payments under 2.d.  Another reading, however, is that, should Jasty provide services after November 1999, he would not be compensated through annual payments (which would have ceased) but only through continued royalty payments, and, if Wright went public, the IPO payments.  That paragraph 2.a., standing alone, could be subject to multiple interpretations is not the last word, however, as we do not interpret individual contract provisions in isolation.  Mass. v. McAdams Mutual Life Ins. Co., 391 F.3d 287, 299 (1st Cir. 2005).

When the terms of the contract are read together, they are unambiguous in providing that Jasty's services were not required after November 1, 1999.  See Nadherny, 390 F.3d at 49 (terms must be construed together as part of "a coherent whole.").  Paragraph 2.b. hinges ten years of royalty payments on the fulfillment of one condition:  the development of an Advance Knee component for which Jasty has had significant design input.  This is in contrast to paragraph 2.d., which conditions IPO payments on both the occurrence of an IPO and Jasty's contemporaneous provision of consulting services.

Wright urges that paragraph 2.a. adds another condition to royalty payments after November 1999:  further services.  If that were so, paragraph 2.a. likewise conditions IPO payments on

further services. But that interpretation would render superfluous the explicit language in paragraph 2.d. conditioning IPO payments on Jasty's providing consulting services. "[C]onstructions that render contract terms meaningless should be avoided." Summit Packaging Sys., Inc. v. Kenyon & Kenyon, 273 F.3d 9, 12-13 (1st Cir. 2001). Where services are required in exchange for compensation, the contract explicitly provides for them. We are convinced that royalty payments were not conditioned on Jasty's provision of services after November 1999.[7] Wright thus breached the contract by halting royalty payments at the end of 2001.

Even if we were to assume arguendo that continued services were required in order for Jasty to be eligible for royalty payments, Wright faces a second, ultimately insurmountable, hurdle on the question of notice. Wright argues that it provided the requisite notice of its intent to terminate the contract, in response to Jasty's alleged breach, through the meeting and letter of October 1998.

Generally, "notice must be clear, definite, explicit, and unambiguous." Seaboard Sur. Co. v. Town of Greenfield, 370 F.3d 215, 223 (1st Cir. 2004) (citing 58 Am. Jur. 2d Notice § 2). Under

---

[7]It is not incongruous to say that Jasty need not have continued to provide consulting services under the contract in order to be entitled to royalty payments. After providing "significant design input," Jasty's entitlement to full royalty payments under the contract was by no means absolute, as the contract could be terminated for cause, and his royalty payments jeopardized, if he were to breach the exclusivity provision.

Massachusetts law, notice "must state with reasonable certainty the essential facts required by law or by contract."  Id. at 223.[8] Here, paragraph 9 permits contract termination for cause upon thirty-day written notice and opportunity to cure.  The October 1998 letter was insufficient under the written notice and opportunity to cure requirement.

The October 1998 letter does not contain the words "breach," "terminate," "notice," or any reference to a thirty-day period.  Rather, the letter is forward-looking, discussing specific future responsibilities that Jasty will undertake, and stating that Patton, and Wright, "look[ed] forward to being able to continue this relationship for a long time."  While the letter did mention that Wright considered certain conduct of Jasty's "unacceptable" and believed it to be "frustrating the very purpose of our contract," these comments do not convey Wright's intent to terminate, nor do they provide a thirty-day opportunity for Jasty to cure -- both required by paragraph 9.  We agree with the

---

[8]Wright argues that Tennessee allows an "actual knowledge" standard for notice that is more lenient than the Massachusetts standard, and might allow a jury to find that Jasty was on notice of the proposed termination.  But the Tennessee principle of law is more narrow:  that written notice requirements may be waived by a party, through conduct indicating "an intent to relieve the other of its duty to comply strictly with the contract."  Writzmann v. Baust, 1988 WL 116384, *3 (Tenn. Ct. App. 1988).  Jasty did not engage in conduct that could be construed as waiving his notice rights under the contract, a point Wright acknowledged at oral argument.  We do not find a relevant distinction here between Massachusetts and Tennessee law.

magistrate judge and the district court in concluding that Wright breached the contract by discontinuing Jasty's royalty payments, and that even if Wright had not been in breach it did not provide the required notice of its intent to terminate.[9]

### III.  Jasty's Cross-Appeal.

### A.  Consumer Protection Claims.

Jasty challenges the district court's decision to grant summary judgment to Wright on the consumer protection claims, Mass. Gen. Laws ch. 93A and Tenn. Code Ann. § 47-18-01.  Jasty alleges that there is a factual dispute about whether Wright engaged in "unfair and deceptive" practices, as the consumer protection statutes forbid.[10]

Chapter 93A requires a showing of conduct that (1) falls within "the penumbra of some common-law, statutory, or other established concept of unfairness"; (2) is "immoral, unethical, oppressive, or unscrupulous"; and (3) causes "substantial injury to [consumers or other businesspersons]."  Serpa Corp. v. McWane, Inc., 199 F.3d 6, 15 (1st Cir. 1999) (citing PMP Associates, Inc.

_____

[9]Because Jasty's right to recover is clear, we need not address Wright's contention that the magistrate judge incorrectly determined that, by continuing to pay Jasty while he was allegedly in breach, Wright waived any argument that Jasty did not comply with the contract.

[10]Tennessee's consumer protection law is similar to the Massachusetts statute.  Our analysis of the Massachusetts statute applies equally to the Tennessee statute.

-18-

v. <u>Globe Newspaper Co.</u>, 321 N.E.2d 915, 918 (Mass. 1975)) (internal quotation marks omitted).

Jasty makes three distinct allegations of unfair conduct by Wright, the most significant of which is his contention that Wright sought to induce him to engage in unethical and illegal kickback activities. The other two allegations concern whether Wright breached the implied covenant of good faith and fair dealing and whether Wright engaged in economic coercion.

The kickback allegation is rooted in Patton's statement in the October 1998 letter that he "accept[s] [Jasty's] commitment to use the Advance Knee in the majority of your knee cases (i.e., 120 of 150 or so.)"[11] Jasty argues that Wright used the October 1998 letter to tie his compensation to his use of Wright products.

Jasty provided documents in support of his claim that Wright pressured him to engage in kickback activities. He submitted an affidavit from an expert in medical ethics, stating:

> Compensation from a medical device manufacturer to a physician that is contingent upon the physician using a medical device manufacturer's products a certain number of times, or a substantial amount of time, or at a volume that the medical device manufacturer, in its discretion, determines is sufficient, <u>is unethical</u>.

---

[11]Jasty does not allege that the contract itself is unfair, pointing to a provision in paragraph 2.b. of the contract designed to prevent kickbacks ("No royalties will be payable on Products . . . sold to or used by hospitals at which you maintain privileges.")

(emphasis added.)[12]  Jasty also submitted a publication of "Special Fraud Alerts" from the Department of Health and Human Services' Office of the Inspector General, 59 Fed. Reg. 65372-01 (Dec. 19, 1994), addressing the Federal Anti-Kickback law.  That statue provides:

> [W]hoever knowingly and willfully offers or pays any remuneration . . . in cash or in kind to any person to induce such person . . . to purchase, . . . order or arrange for or recommend purchasing . . . or ordering any good, . . . or item for which payment may be made in whole or in part under a Federal health care program . . . shall be guilty of a felony.

42 U.S.C. § 1320a-7b(b)(2).  The inspector general publication clarifies that a payment may be considered improper if "given to a patient, provider or supplier for . . . recommending or requesting [a change] from one product to another."  In short, compensating someone in order to induce them to buy or use medical products is prohibited, as is receiving such compensation.  Id. § 1320a-7b(a)(2).

Thus, Jasty asks us to consider both professional ethical standards and federal law in evaluating whether Wright engaged in unfair conduct.  We cannot ignore, however, Jasty's own conduct in light of those same standards.  In evaluating a 93A claim, courts

---

[12]The affidavit relies on, inter alia, the American Academy of Orthopaedic Surgeons Code of Medical Ethics and Professionalism, American Medical Association Opinion E-8.0501 and the American Medical Association Principles of Medical Ethics.

"must evaluate the equities between the parties. . . . [A] plaintiff's conduct, his knowledge, and what he reasonably should have known may be factors in determining whether an act or practice is unfair." Swanson v. Bankers Life Co., 450 N.E. 2d 577, 580 (Mass. 1983). Jasty is bound by the same ethical standards and the same federal law, and he entered into this arrangement and accepted both the flat payment and royalty payments until 2001. There is no evidence on the record that Jasty complained of the terms or refused to comply. In view of Jasty's own conduct in the matter, no reasonable factfinder could conclude that Wright violated Jasty's rights under the consumer protection acts through the alleged kickback activity.[13]

We also find insufficient support in the record for Jasty's remaining two consumer protection claims. The contention that Wright breached the implied covenant of good faith and fair dealing by terminating Jasty's contract in September 2001 fails because withholding payment based on a genuine dispute about what a contract requires does not violate Chapter 93A. Duclersaint v. Fed. Nat'l Mortgage Ass'n, 696 N.E.2d 536, 540 (Mass. 1998). Similarly unavailing is Jasty's argument that Wright engaged in economic coercion by trying to pressure him to accept less money than he deserved, in the course of terminating the contract.

---

[13]We also question whether Jasty has suffered any damages from the alleged practice.

-21-

Wright's conduct between September 2001 and March 2002 may be viewed as pressuring Jasty to walk away from the contract; however, a party that simply withholds funds but does not engage in any other coercive action is not liable under Chapter 93A.  See Boston Pilots v. Motor Vessel Midnight Gambler and East Coast Excursions, Inc., 357 F.3d 129, 135 (1st Cir. 2004) (defendant's repeated offerings of settlements of less than plaintiff's view of amount due under contract "treads close to the line between a sharp-edged business tactic and an unfair subterfuge," but held not a 93A violation).

## B.  Compelled Testimony.

Jasty disputes the district court's decision not to allow him to compel Wright's damages expert to testify.  At the damages trial, Wright declined to call its expert Elliot Roth, who had been deposed and designated as a witness expected to testify.  Jasty sought to call Roth as a witness.

A district court's ruling as to whether to compel a witness to testify is reviewable for an abuse of discretion.  See Gomez v. Rivera Rodriguez, 344 F.3d 103, 114 (1st Cir. 2003). Specifically, a trial court has discretion to decide whether to require a witness to testify for an opposing party.  See Feliciano v. Rullan, 378 F.3d 42, 57 (1st Cir. 2004); see also Peterson v. Willie, 81 F.3d 1033, 1037-38 & n.4 (11th Cir. 1996) ("Once a witness has been designated as expected to testify at trial, there

-22-

may be situations when the witness should be permitted to testify for the opposing party . . . . This decision is committed to the sound discretion of the district court.")  In response to Jasty's attempt to introduce the deposition of the expert into the record, the court stated, "[compelling the opposing party's expert to testify] doesn't happen because it doesn't happen . . . an expert is not just like every other witness and cannot be sort of conscripted by an opponent."  We do not read this as a statement that the court believed that it lacked authority to require the witness to testify under any circumstances.

In the absence of any showing of a need for Jasty to call the witness, we cannot say that the court failed to exercise its discretion.  Furthermore, if there was error it was harmless.  See Feliciano, 378 F.3d at 57 ("We will reverse only if a determination has unfairly prejudiced the complaining party.")  Jasty acknowledges that the amount of damages actually awarded by the jury was similar to the lost royalty calculations that Jasty's own expert had prepared.  Roth's damages calculation was lower than that of Jasty's expert.  Thus, there was no prejudice from Jasty's inability to call Roth to testify.

**C.  Choice of Law.**

Jasty appeals the district court's determination following the damages trial that Tennessee law should determine the amount of prejudgment interest Jasty is entitled to, arguing that

Massachusetts prejudgment interest law should control instead.[14] We review choice of law determinations de novo. <u>Reicher v. Berkshire Life Ins. Co. of Am.</u>, 360 F.3d 1, 4 (1st Cir. 2004).[15] We first state the undisputed facts and then look to the law of the forum state for guidance in selecting the appropriate prejudgment interest rate.

Wright is incorporated in Arlington, Tennessee, and manufactures components for medical devices in Tennessee. Its manufacturing processes are based on research and design input from surgeons all across the country -- efforts that take place both in Tennessee and elsewhere. The devices are used in surgeries nationwide. During the relevant period, Jasty was a surgeon, researcher and Wright consultant living in Massachusetts. He was a participant in the design process for the Advance Knee, an

---

[14]Under Tennessee law, the award of prejudgment interest is discretionary, and should be determined in accordance with the principles of equity. Tenn. Code. Ann. § 47-14-123. Here, the district court selected the interest rate used in federal civil actions, "a rate equal to the weekly average 1-year constant maturity Treasury yield." 28 U.S.C. § 1961(a). Massachusetts, on the other hand, applies a statutory fixed interest rate of twelve percent in most cases. Mass. Gen. Laws, ch. 231, §§ 6B-6C. Jasty argues that under Massachusetts law, he would be entitled to approximately $650,000 in additional prejudgment interest over the $138,648 he was awarded.

[15]Jasty argues that Wright's conduct waived any argument that Tennessee law applied. As the choice of law issue did not arise until after trial, "the issue of choice of law had never been squarely presented by either party" and thus Wright has not waived this issue. <u>Levin</u> v. <u>Dalva Bros., Inc.</u>, 459 F.3d 68, 72 (1st Cir. 2006).

endeavor which involved in-person meetings in Tennessee and other states, as well as meetings over the phone that he participated in from Massachusetts. Under the contract, Jasty also performed surgeries using Wright's Advance Knee, and he engaged in studies and co-authored publications concerning the Advance Knee. The bulk of these latter activities were conducted by Jasty in Massachusetts.

The individual contracts of other surgeon-consultants on the design team were not admitted into evidence. The record is clear, however, that Jasty and other surgeons negotiated aspects of their contracts as a unit. For example, there is correspondence regarding the surgeons' collective desire to include the termination as-of-right clause in paragraph 9, and to include the clause providing for payment of royalties in the event of death or incapacitation, also in that paragraph. Furthermore, there was evidence that changes to contract provisions were undertaken collectively during the pendency of the agreement. Specifically, the record contains discussions about adjustments to royalty rates that were addressed to all team members. Jasty's contract was initially drafted in Tennessee and negotiated through the mail. Jasty signed the contract in Massachusetts, Wright in Tennessee.

Selecting a prejudgment interest rate is a substantive, rather than a procedural, matter in Massachusetts. Quaker State Oil Refining Corp. v. Garrity Oil Co., 884 F.2d 1510, 1514 (1st

Cir. 1989). Massachusetts uses a "functional" approach to choice of law determinations, in order to establish which state has the "more significant relationship to the transaction." Hendricks & Assocs., Inc. v. Daewoo Corp., 923 F.2d 209, 213 n.3 (1st Cir. 1991) (citing Bushkin Assocs., Inc. v. Raytheon Co., 473 N.E.2d 662, 668 (Mass. 1985) (quoting Restatement (Second) of Conflict of Laws, § 188(1) (1971))). There are three categories of factors to consider under Bushkin: 1) "contacts," 2) the Restatement § 6(2) factors and 3) the "Leflar factors." Because some of these factors are either redundant or not determinative, we focus on "considerations particularly relevant to the case." Reicher, 360 F.3d at 5 (citing Bushkin, 473 N.E.2d at 670).

We consider first which state has the most significant "contacts" with the transaction. Bushkin, 473 N.E. 2d at 669. Contacts may include:

> (a) the place of contracting, (b) the place of negotiation of the contract, (c) the place of performance, (d) the location of the subject matter of the contract, and (e) the domicil, residence, nationality, place of incorporation and place of business of the parties.

Id. Three of the factors do not tip the balance either way in this case but two require further analysis: "place of performance" and "location of subject matter."

The first factor, "place of performance," favors the application of Tennessee law. While Jasty would perform primarily

in Massachusetts, he would work outside of Massachusetts with greater frequency than Wright would work outside of Tennessee.

As to the second factor, the subject matter of the contract is Jasty's services in connection with development and marketing of Wright's products. The product components themselves were designed and manufactured in Tennessee. Specific portions of the contract suggest that Wright intended significant work to be performed in Tennessee or at least outside of Massachusetts. The contract requires Jasty to take "[t]ime away from your practice necessary to participate in clinical consultant meetings and/or technical meetings . . . " (paragraph 1.b.); and states that "any and all development work will be performed, to the extent necessary, with laboratory and other resources provided by [Wright], and not the university with which you are affiliated" (paragraph 3). Though these provisions could be interpreted to favor either Massachusetts or Tennessee, taken together with place of performance, they favor the application of Tennessee law.

The Restatement factors reinforce this conclusion. Those factors are the most relevant of the following "factors" from the Restatement (Second) of Conflict of Laws, §6(2):

> (a) the needs of the interstate and international systems, (b) the relevant policies of the forum, (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue, (d) the protection of justified expectations, (e) the basic policies underlying the particular field

> of law, (f) certainty, predictability, and uniformity of result, and (g) ease in the determination and application of the law to be applied.

Restatement (Second) of Conflict of Laws, § 6(2); Bushkin, 473 N.E. 2d at 670. Here, the most relevant factor is "certainty, predictability and uniformity."[16]

Wright negotiated contracts with the surgeons on the design team collectively, at least in part. While each surgeon would perform some of the services under the contract in his or her home state, each surgeon also shared a common tie to Tennessee: design team meetings were often held in Tennessee, development and refinement of products occurred in Tennessee, and compensation -- annual payments, royalties and IPO payments -- was administered by Wright in Tennessee. In a situation such as this one, where one party has contracted for the services of independent contractors based in different states, there is greater certainty and predictability for all parties if those contracts, negotiated at similar times and on similar terms, are all governed by the same state's laws, rather than by the law of the state where an

---

[16]We do not conclude that the relevant policies and interests of the states involved represent a decisive factor. Both Tennessee and Massachusetts have an interest in the calculation of prejudgment interest. Tennessee's policy vests courts applying its law with greater discretion to fashion a remedy that fits the circumstances; Massachusetts' policy treats all litigants similarly by compelling a particular rate. The states may have different policy goals in mind, but we are reluctant to take this as an indication that one state has a greater "interest" than another in setting a prejudgment interest rate.

-28-

independent contractor happens to live. See Potomac Elec. Power Co. v. California Union Ins. Co., 777 F. Supp. 968, 973 (D.D.C. 1991) (in liability insurance context, "common sense suggests that, knowing of the potential for claims in any number of states . . . the parties would consider the insured's principal headquarters as the one jurisdiction which ties all potential parties together."). The application of Tennessee law thus better serves the interest of "certainty, predictability and uniformity."[17]

We agree with the district court's conclusion that Tennessee's prejudgment interest law should control Jasty's damages award.[18]

## IV.  Conclusion.

The entry of summary judgment in favor of Jasty on his breach of contract claim and on his opposition to Wright's counterclaims is **affirmed**.  The entry of summary judgment for Wright on Jasty's consumer protection claims, and the denial of

---

[17]The third category involves the "Leflar factors." Bushkin, 473 N.E. 2d at 670 n.7 (quoting R.A. Leflar, American Conflicts Law 195 (3d ed. 1977)).  These factors do not add to our analysis in this case.

[18]Jasty also argues that the Tennessee Supreme Court's holding in Otis v. Cambridge Mut. Fire Ins. Co., 850 S.W.2d 439, 446-47 (Tenn. 1992) precludes the use of compound interest in prejudgment interest awards.  In Otis, the court struck down a prejudgment interest award set at ten percent compounding interest, not because of the compounding, but because the award exceeded the state's statutory cap on prejudgment interest of ten percent (simple) interest per annum.  Id. at 447; see also Tenn. Code Ann. § 47-14-123.  Jasty does not allege that the award here exceeded that cap.

-29-

Wright's summary judgment motion on Jasty's breach of contract claim, is **<u>affirmed</u>**.